STATE, RESPONDENT, *v.* DAVIS, APPELLANT.

(Nos. 4,730, 4,741.)

(Submitted June 3, 1921. Decided June 27, 1921.)

[199 Pac. 421.]

*Criminal Law—Murder—Change of Venue—Discretion—Local Prejudice—Newspaper Articles—Affidavits—Conclusions—Insufficiency—Insanity—Evidence—Harmless Error—Justification or Mitigation—Proper Instruction.*

Murder—Change of Venue—Discretion.
  1. An application for change of place of trial of a criminal cause is addressed to the sound discretion of the court, the ruling of which will not be disturbed on appeal unless abuse thereof is shown.

Same — Change of Venue — Local Prejudice — Newspaper Articles — Affidavits—Conclusions—Insufficiency.
  2. Where affidavits of counsel for defendant filed in support of

---

2. Weight of newspaper articles as evidence of prejudice against accused entitling him to change of venue, see note in 18 Ann. Cas. 769.

a motion for change of place of trial of a charge of murder did not contain extracts from alleged inflammatory newspaper articles circulated in the county, and the record on appeal did not present the *voir dire* examination of the jurors as tending to show any unusual circumstances in obtaining a jury, the mere statements therein that there had been talk of lynching and that the tale of the crime had been printed in newspapers and generally read by the inhabitants of the county, were bald conclusions and properly disregarded by the trial court.

Same—Exhibits—Identifications—Evidence—Sufficiency.
    3. Under the rule that to warrant the admission in evidence of the weapon with which the crime for which defendant is on trial was committed a *prima facie* showing of its identity and connection with the offense is sufficient; clear, certain and positive proof not being required, evidence held sufficient to admit a revolver and the shells with which it was loaded, found near the scene of the crime.

Same—Insanity—Evidence Incidentally Showing Prior Conviction and Escape from Prison—Admission not Error.
    4. Where, in a prosecution for murder, the defense is insanity, every act of defendant in his life is subject to scrutiny; hence the fact that a deputy warden of the state prison was permitted to state while testifying on the question of defendant's sanity that he first met him in the prison as a convict and that he had twice escaped therefrom was not objectionable as an endeavor to prejudice the jury by showing that he had been previously convicted of crime, although he was not charged with prior conviction.

Same—Technical Errors—Insufficient to Reverse Judgment.
    5. A conviction will not be set aside for technical errors or defects appearing in the record which do not affect the substantial rights of the accused.

Same—Insanity—Opinion Evidence of Layman—Harmless Error.
    6. Error in permitting a layman to give his opinion as to defendant's sanity without having qualified under subdivision 10 of section 7887, Revised Codes, as an intimate acquaintance, was harmless where the only evidence of defendant's insanity consisted of his behavior on the stand and of his incoherent and meaningless answers, all the witnesses testifying to his mental condition declaring him sane, without contradiction or conflict.

Same—Justification or Mitigation—Burden of Proof—Correct Instruction.
    7. The contention of defendant that since no one was present when the shot which killed deceased was fired, the court erred in giving an instruction in the words of section 9282, Revised Codes, heretofore construed to mean that if the jury should find the fact that defendant did the killing, the burden of proving circumstances mitigating the offense from murder to manslaughter or justifying it devolves upon him, unless the evidence which proves the killing by the defendant also shows that it was manslaughter or justifiable, *held* without merit.

*Appeals from District Court, Beaverhead County; Jos. C. Smith, Judge.*

E. C. DAVIS was convicted of murder in the first degree, and appeals from the judgment and an order denying him a new trial. Affirmed.

*Mr. W. J. Cushing, Mr. C. W. Robison* and *Mr. John Collins,* for Appellant, submitted a brief; *Mr. Collins* argued the cause orally.

The affidavits and testimony offered in support of the motion for change of venue show that the feeling in Beaverhead county was such that defendant could not there obtain an impartial trial. The application was heard immediately before the trial began. A jury was in attendance, and even some members of the jury were discussing the matter freely, and some of them had announced that defendant should have been lynched, that it was too bad that he was ever brought back by the posse alive. It further appears that various newspapers having a wide circulation in the county gave such accounts of the homicide as would prejudice a jury against the defendant. (*State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026, and cases cited; *State* v. *Hillman,* 42 Wash. 615, 85 Pac. 63; *State* v. *Dwyer,* 29 Nev. 421, 91 Pac. 305; *State* v. *Olds,* 19 Or. 397, 24 Pac. 394; *People* v. *Suesser,* 132 Cal. 631, 64 Pac. 1095.)

It was error to permit the gun which was found at Monida to be introduced in evidence; the record fails to disclose how long prior to the homicide it was found. (*People* v. *Hill,* 123 Cal. 571, 56 Pac. 443; *State* v. *Kehr,* 133 Iowa, 35, 110 N. W. 149.)

No witness was present at the killing; the evidence upon which defendant was convicted was therefore purely circumstantial, and whether defendant did or did not commit the homicide was a vital issue to be determined by the jury. The court, however, instructed the jury that defendant had committed the act, or at least instructed them that they might so assume. Possibly that instruction might pass if defendant had confessed the killing and relied only upon self-defense or insanity, or other excuse; but where, as here, the act of killing

[60 Mont. 426.]

as well as defendant's sanity is in issue, that instruction has no possible application. (*Barrow* v. *Territory,* 13 Ariz. 302, 114 Pac. 975; *People* v. *Matthai,* 135 Cal. 442, 67 Pac. 694; *Territory* v. *Tunnell,* 4 Mont. 148, 1 Pac. 742; *Territory* v. *Johnson,* 9 Mont. 21, 22 Pac. 346; *State* v. *Sloan,* 35 Mont. 367, 89 Pac. 829; *State* v. *Allen,* 34 Mont. 403, 87 Pac. 177.)

*Mr. Wellington D. Rankin,* Attorney General, and *Mr. L. A. Foot,* Assistant Attorney General, submitted a brief; *Mr. Foot* and *Mr. T. E. Gilbert,* County Attorney, argued the cause orally.

The publishing of accounts in newspapers pretending to give the facts of the crime, if not inflammatory in their nature, are not sufficient to justify granting a change of venue. (*State* v. *Brown,* 130 Iowa, 57, 106 N. W. 379.) It is a presumption of law that the defendant can have a fair and impartial trial in the county where the offense was committed, and the burden is upon him to show clearly otherwise (*Johnson* v. *State,* 1 Okl. Cr. 321, 18 Ann. Cas. 300, 115 Pac. 1059), and that the prejudice existing in the county is such that its natural tendency will be to intimidate or swerve the jury. (*State* v. *Gordon,* 32 N. D. 31, Ann. Cas. 1918A, 442, 155 N. W. 59.) An application for a change of venue in a criminal case is addressed to the sound discretion of the court, and its refusal is not reversible error, unless it appears from the facts presented on the application that the court acted unfairly, or that there was a palpable abuse of judicial discretion. (16 C. J., sec. 306, p. 204; *People* v. *Riggins,* 159 Cal. 113, 112 Pac. 862; *People* v. *Elliott,* 80 Cal. 296, 22 Pac. 207; *State* v. *Nelson,* 91 Minn. 143, 97 N. W. 652; *Jahnke* v. *State,* 68 Neb. 154, 94 N. W. 158.)

Appellant was seen with a pistol in his hands immediately after two shots were fired; a pistol was found not far from the scene of the homicide that agreed in caliber and make with empty shells found at the scene of the homicide; loaded shells of the same caliber and make of the pistol and the empty shells

were found in appellant's possession; appellant admitted that he threw away the pistol to which the shells belonged. These items are all so closely connected with the homicide as to practically remove all doubt that the pistol found was the one seen in the hands of appellant and the weapon that caused the death of the deceased, and were properly admitted as evidence. (*People* v. *Byrne,* 160 Cal. 217, 116 Pac. 521; *Fuller* v. *State,* 147 Ala. 35, 41 South. 774; *State* v. *Laudano,* 74 Conn. 638, 51 Atl. 860; *Boynton* v. *State,* 115 Ga. 587, 41 S. E. 995; *State* v. *Aspara,* 113 La. 940, 37 South. 883.)

MR. COMMISSIONER JACKSON prepared the opinion for the court.

The defendant was convicted of murder in the first degree on May 19, 1920, and on May 24 he was sentenced to be hanged. From the judgment of conviction, and from an order denying his motion for a new trial, he appeals.

Before the trial was begun, the defendant applied to the trial court for a change of place of trial. The motion was denied, and defendant predicates error. In support of the petition are the affidavits of W. J. Cushing and C. W. Robison, both counsel for the defendant. Briefly, the affidavits state that the arrest of the defendant was made by a *posse commitatus,* consisting of from fifty to one hundred armed men; that at the time of the arrest, and subsequently, it was freely remarked by various members of the posse and others that defendant should be lynched; that the newspapers of the county and the papers of Butte, Montana, which have a large circulation in Beaverhead county, published statements concerning the defendant and the manner of the commission of the alleged crime and the arrest of the defendant, which statements were generally read by the people of the county of Beaverhead; that, on account of the statements and articles, the people of Beaverhead county were so prejudiced against the defendant that he could not have a fair trial in the county, and belief was expressed that it was impossible to obtain a jury in the county

that had not formed an opinion as to the guilt or innocence of the accused, such as would disqualify them as jurors.

A hearing was had on the petition, Messrs. Cushing and Robison being the only persons to testify. Mr. Robison's evidence went solely to the talk he had heard, and that of Mr. Cushing, in addition to the talk, went to the effect that the newspapers of the county "published somewhat of an extended statement of the commission of this crime and the facts leading up to the arrest and confinement of the prisoner." Both witnesses stated they believed it would be impossible to secure a fair trial or to secure an unprejudiced jury in the county. No counter-affidavits nor proof were offered by the state.

The Constitution guarantees to everyone charged with a [1, 2] crime a fair trial before an impartial jury, and it is settled law in this jurisdiction that an application for change of place of trial is addressed to the sound discretion of the trial court, and, unless an abuse of this power is shown, its ruling will not be disturbed. (*State* v. *Spotted Hawk*, 22 Mont. 33, 55 Pac. 1026, and cases there cited.) No extracts from the newspapers were attached to the affidavits, and the record is silent as to what the stories contained. The bald statement that the tale of the crime was printed in newspapers and generally read by the inhabitants of the county, and that therefore the defendant would be deprived of his constitutional right of fair trial by an impartial jury, is a flat conclusion, and was properly disregarded by the trial court. (*State* v. *Spotted Hawk, supra; Territory* v. *Manton,* 8 Mont. 95, 19 Pac. 387.) No fact in the affidavits or testimony appears to move judicial discretion, save the statements that there had been talk of lynching the defendant, and its effect upon the popular mind.

It must be borne in mind that, while the defendant had been arrested by an armed posse, and at a time when feeling was intense, the inviolability of his person was observed, and in accordance with the high concept of respect for justice the law was permitted, without let or hindrance, to take its course. Naturally, whenever a brutal crime has been committed, there

are many whose unbridled tongues vent emotion, but it does not follow that a community's judgment is warped. The record does not disclose the *voir dire* examination of the jurors, but it suffices to say that, when a jury is obtained on a homicide case after the examination of but fifty-six men, and no unusual condition is apparent, the statement as to prejudice and the impossibility of securing a fair and impartial jury falls. The showing is entirely insufficient to permit this court to disturb the ruling of the lower court in denying the motion.

"The trial judge is generally familiar with the local situation; he knows the prevailing sentiment of the people, in so far as it finds oft-repeated expression; he knows all the facts and circumstances proper to be considered in determining the matter; he may know the persons who make affidavits suggesting undue excitement or prejudice, and can properly estimate the weight to be given such affidavits. A judicial discretion exercised under such circumstances should not be interfered with, unless its abuse is so clearly manifest as to call for a reversal." (*State* v. *Welty,* 65 Wash. 244, 118 Pac. 9; see, also, *State* v. *Caseday,* 58 Or. 429, 115 Pac. 287; *Johnson* v. *State,* 1 Okl. Cr. 321, 18 Ann. Cas. 300, 97 Pac. 1059; *People* v. *Elliott,* 80 Cal. 296, 22 Pac. 207; *Jahnke* v. *State,* 68 Neb. 154, 94 N. W. 158, 104 N. W. 154.)

It appears that shortly after noon on April 21, 1920, C. K. Wyman, sheriff of Beaverhead county, in response to a telephoned request from J. B. Egan, of Monida, came to the latter place from Dillon, Montana, to arrest the defendant, accused of the theft of a bridle. Egan, in order to keep the defendant until the sheriff arrived, had engaged him to remove some carcasses from a corral. On his way from the train, the sheriff was met and accompanied to the hotel by the witness Raymond W. Knott. When they entered the place the defendant was pointed out to the sheriff, who tapped him on the shoulder and informed him he was under arrest. The defendant said, "All right," picked up his hat, and added, "I

have a coat out in the cabin, and I would like to get that."
The sheriff and defendant then went out the front door of
the hotel, and turned to the left. Knott left by the same
door immediately after they had gone, turning to the right,
and walking down the street until he came to the front
entrance of the Egan store, a distance of about 200 feet from
the hotel, where he met a man named Robbins, and heard the
sound of two shots. He ran back on the same street a short
distance from the store, and, looking down an alley, saw the
defendant, gun in hand, standing about three feet in front of
Wyman, whose back was toward witness, and who was then
staggering. Knott testified: "It could not have been more
than a few seconds from the time I heard the shots until I
got into the position I indicated at the gate, where I could
see Mr. Wyman and the defendant Davis, because I ran the
twenty feet or so that was between me and the alley." The
witness then ran back into the store, told those who were
there that the sheriff had been shot, went out the rear door
and around an oil house, to the point where he had seen the
defendant and Wyman. The defendant had disappeared, and
Wyman was lying on the ground. The witness roused him,
asked him what had happened, and the wounded man an-
swered: "He shot me," Knott then left Wyman, went back
into the store, reported the sheriff was dead in the alley, picked
up a rifle, and went out with others after the defendant. From
this point his testimony is: "I saw the defendant after that.
In fact, I saw him practically all the time, because we were
trailing him until he got to the cabin. I saw the defendant
on horseback the next time after I had seen him standing near
Wyman with a gun in his hand; at that time he was in the
corral. At that time the defendant would be to the left of the
door marked 'F.' When I saw the defendant he was on his
horse, and was trying to make it jump the bars, jump the
corral at the point marked 'Bars' on the map, State's Exhibit
No. 1. I just saw the defendant for an instant then. He was
still on horseback the last time I saw him. The next time I

saw the defendant he was running down the railroad track. At that time he was right on the track. There is a railroad Y in there, and he was crossing the Y. The defendant, at the time I saw him on the track, was running in this direction, which, according to the map, would be northwest. He was running on the right-hand side of the track at that time; that would be as you look down the track from Monida, toward Dillon. Mr. Robbins was with me at that time. Mr. Robbins and I struck out to the right of him, trying to circle around the defendant. I had a rifle at this time. I did not use my rifle at that time. Mr. Robbins did not use his at that time either. Mr. Robbins used his rifle in the corral. I was not present the first time that Mr. Robbins shot. I said that Mr. Robbins and I started to follow the defendant. I imagine we went one-eighth of a mile from the railroad track out through the hills with the intention of cutting him off at the bend in the track. That would be about northwest of Monida; it would be more northerly than the track runs. After that time we kept the defendant in sight. We did that by following him. Mr. Robbins and Mr. Miller were in the party at that time. As a rough estimate, I would say that we were separated from the defendant from one-quarter to a half of a mile. I know that Mr. Miller had some glasses with him that day. Mr. Miller had a pair of high-powered binoculars with him at that time that he used. I could see the defendant myself most of the time. We followed the defendant in this northwesterly direction from Monida for about one mile. At that time we saw the defendant off to the left of the track after we got up on top of the hills. When we saw the defendant to the left of the track, he was traveling in a southwesterly direction. Mr. Robbins and I were still following him. We followed the defendant until we came to the cabin the defendant was in. That is the same cabin in which the posse captured him.''

The defendant was arrested that afternoon by Dan Mooney, the under-sheriff of the county, who had gone to the cabin

[60 Mont. 426.]

with a posse, and found it already surrounded by others. The defendant, who was in the cellar, was armed with a 30–30 Winchester carbine. He inquired "if there was a sheriff outside," and, upon being informed that there was, he said, "All right; let the law take its course." After the arrest, the defendant was searched, and sixteen 32-caliber automatic shells were taken from his person. When asked where his 32-automatic pistol was, he said he had none; later he said he "ditched it," and then said, "I threw it away." Finally, he claimed to have buried it in the cellar of the cabin, between the floor and top of the cellar. The cellar was searched, but the pistol not found there. Witness Knott testified to the finding of a 32-automatic Colt pistol. "Exhibit No. 4, marked for identification for the state, is a 32-automatic Colts. I have seen that before. It is the gun I brought down here from Monida. This gun was found in Monida by Mr. Robbins and myself. I first saw this gun at Monida. I saw it back of the warehouse, the lower barn. It would be northwest of the lower barn. When I first saw the gun it was lying on the ground. Mr. Robbins picked the gun up. I was present at that time. At that time the gun was taken to the store by Mr. Robbins. Mr. Robbins handed the gun to Mr. Egan, and Mr. Egan give it to me to put in the safe. I later removed it from the safe. When I removed it from the safe I brought it down to Dillon. At Dillon I delivered it to the sheriff's office. I delivered the gun to the same officer I delivered the shells to." On the day following the tragedy, Knott, H. K. Robbins and J. B. Egan, making a search at the scene of the crime, found two empty 32-caliber automatic shells, which were in evidence at the trial.

In specifications 2 and 3, defendant urges error in the [3] admitting, over objection, the pistol and the shells with which it was loaded when found. In our opinion there is no merit to this contention, as there was ample evidence connecting the defendant with the exhibits. In fact, the incidents are all so closely connected with the homicide as to foreclose

doubt; two shots were heard; defendant was seen with a gun
in his hand a few seconds later, standing in front of the
sheriff, who was staggering about wounded; the injured man
said, "He shot me"; two empty 32-caliber automatic shells
were found very close to where they had been standing; six-
teen loaded shells of the same kind and caliber were discov-
ered on the person of the defendant; defendant's own admis-
sion that he had thrown a 32-caliber automatic pistol away,
and the finding and delivery to the officer of the gun and its
load.

"To warrant the admission in evidence of an instrument or
weapon as the one with which the crime was committed, a
*prima facie* showing of identity and connection with the crime
is necessary, and sufficient; clear, certain, and positive proof
is not required." (16 C. J. 618, 619, and cases there cited;
*People* v. *Byrne,* 160 Cal. 217, 116 Pac. 521, 530.)

Defendant in his case sought by his actions and answers on
the stand to bring his sanity in question. When interrogated,
his responses were incoherent and meaningless. The two
guards who had been employed to watch the defendant, one
from the 24th and the other from the 29th of April, up to
and including the time of the trial, also were called on his
behalf, and after relating his actions and talk while in con-
finement, which they said were about the same as when on
the stand, both declared him to be sane in their opinions. This
was the defendant's entire case, and, as will be seen, there is
not a scintilla of proof tending to show mental weakness, save
his own demeanor. In rebuttal, together with under-sheriff
Mooney, Walter Nesbit and J. B. Egan, the state produced
Drs. Scanland, Bolton and MacMillan, with wide experience
as experts on mental diseases. They testified from actual
physical tests and observation of the defendant that he was
sane, and simulating mania. In fact, his simulating was dem-
onstrated to the jury when, as Dr. Scanland, among other
symptoms, related that maniacs are given to singing and crying
out occasionally, the defendant, who had not done so before,

became exceedingly boisterous, and cried out. Mooney, the under-sheriff, testified to the conversation he had with the defendant after his arrest by the witness and the posse, in which defendant talked and acted rationally, detailing the arrest by the sheriff, Wyman, denying he had seen Wyman after they left the hotel, and relating that he was going to ride his horse to Dillon, but changed his mind, and decided to hunt jack-rabbits, and that he had gone to the cabin, where he was captured, to cook a meal.

In assignments 4 and 5, error is alleged, in that, over ob- [4] jection, the witness Nesbit, called in rebuttal, was permitted to answer the question: "Was he sent there [to prison] for a crime?" and in overruling the objection to the same witness referring to a commitment to fix the date of defendant's second escape from the state prison. It is argued at some length that the defendant was not charged with a prior conviction, and that it could not in any case be proved by the oral testimony of the witness, and that, under the pretext of refreshing his memory by looking at the commitment, the purpose was to prejudice the jury.

Counsel mistook the situation. The witness Nesbit was the assistant deputy warden of the Montana state prison, who had known the defendant under the name of Albert Yek, as a convict in the prison from June, 1913, until March 21, 1920, and saw and observed him every day during that time, except during two short intervals, aggregating about two months, during which time Yek was a fugitive, having escaped from prison. His testimony was entirely on the sanity phase of the case, and he testified the defendant was sane. No objection was made to his qualifications under subdivision 10, section 7887, Revised Codes. He had already testified without objection: "That man's name is Albert Yek. I first met that man in June, 1913. At that time he entered the prison." This was sufficient to apprise the jury that the man had been a convict and the question objected to could not operate to the prejudice of the defendant. As was aptly stated by the trial judge,

defendant's sanity being in question, every act of his life was subject to scrutiny, and if it fell within prison walls it would have to be followed there. "To judge the mental deficiency of a person, the entire conduct of the individual through life may be taken into account." (*St. George* v. *Biddeford,* 76 Me. 593; *State* v. *Colbert,* 58 Mont. 584, 194 Pac. 145.) Later in his testimony, from his independent recollection, the witness said: "At the time I observed the actions of the defendant, at the time he was in the penitentiary, they were just the same as any other person in there. The defendant was at the state prison from June, 1913, until in November, when he escaped. The defendant was finally discharged from the state prison on March 21, 1920. He escaped some time in November, 1913. He was later captured in Washington. After the defendant was captured he was brought back to the Montana state prison. He was returned to the prison in January, 1914. From January, 1914, until March 21, 1920, the defendant was at the state prison at Deer Lodge, Montana, as a prisoner. The defendant made one other escape. In order to give the date of the escape, I would have to look at the commitment"—all of which presented to the jury the knowledge witness had of defendant's actions, and his opportunity for observation. The date of the second escape was immaterial. It was already in [5] evidence defendant had escaped twice. By no course of reasoning can prejudice be predicated, since the testimony was entirely directed to the defendant's mental condition and the witness' time and opportunity for observing his actions. "For many years this court has uniformly adhered to and enforced the rule that a conviction will not be set aside for technical errors or defects appearing in the record which do not effect the substantial rights of the accused." (*State* v. *Brooks,* 57 Mont. 480, 188 Pac. 942.) There is no merit to assignments 4 and 5.

The sixth assignment was that the court erred in permitting [6] to be given opinion evidence of defendant's sanity by a layman, J. B. Egan, who, according to the record, had seen,

talked with, and employed the defendant on the day of the homicide. Obviously, the witness had not qualified under subdivision 10, section 7887, Revised Codes, in that he did not come within the sphere of intimate acquaintanceship; but while the court erred in admitting his opinion, the error was harmless under all the circumstances of the case. In *State* v. *Penna*, 35 Mont. 535, 90 Pac. 787, relied on by defendant, there was much conflicting evidence as to the mental condition of the accused, and the court properly held that, under circumstances as presented at the trial, it was prejudicial error to admit the testimony of news-writers who had not qualified under the intimate acquaintanceship statute. In *State* v. *Leakey*, 44 Mont. 354, 120 Pac. 234, also cited by the defendant, the court correctly held that, in conjunction with other errors, the trial court erred in permitting the witness George Albert to express an opinion that the defendant was sane. In this case, likewise, was there much evidence conflicting in character as to the prisoner's sanity. But every case must be judged in the light of its individuating characteristics, and upon its own peculiar facts and circumstances. No parallel can be drawn between the cases cited and this case. If all of the evidence in the instant case did not point unerringly to but one conclusion, this court might have to reverse the judgment, and order a new trial.

The state in its case in chief unquestionably established a state of facts that would support the verdict. The burden then devolved upon the defendant to prove circumstances of mitigation, or that would justify or excuse the act. This the defendant did not do, save by exhibiting to the jury his demeanor on the stand, and by incoherent answers. All of the witnesses in this case who testified as to the mental condition of the accused declared him sane. Therefore, there being no contradictory or conflicting evidence, we hold that, while the opinion evidence of the witness Egan was error, the defendant was not injured, and cannot complain. "It is further claimed the court erred in allowing proof to be made of the fact that

a number of fires were set by Warrick and the defendant after the pile of baled hay was kindled, and on the same night. Conceding that proof of after-committed offenses is not admissible in support of a criminal charge, we feel wholly justified in this case in resolving the error against the defendant, for the reason that upon the whole case we think that the conviction was just, and that there has been no miscarriage of justice." (*People* v. *Wilkinson,* 30 Cal. App. 473, 158 Pac. 1067.)

"Conceding error, and that the objection was properly raised in time, under the whole evidence, which was practically without dispute, and uncontradicted as to any part or particular, no such prejudice could have been worked to defendant's rights as would amount to a miscarriage of justice." (*People* v. *Warr,* 22 Cal. App. 663, 136 Pac. 304.)

The defendant then contends that, since no one was present [7] at the actual firing of the shots that killed Wyman, the court erred in giving the following instruction: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

This instruction is the statute of the state (sec. 9282, Rev. Codes), and was construed in *Territory* v. *Manton, supra:* "It means that if the jury find the fact of the killing, and that the prisoner did it, then the burden of proving circumstances which mitigate the offense from murder to manslaughter, or justify the killing altogether, will devolve on the accused, unless the very evidence itself which proves the killing, and that it was done by the prisoner, also shows it was manslaughter, or justifiable homicide." (See, also, *State* v. *Colbert, supra.*) The jury in this case was fairly and properly instructed, and no error was made in giving the instruction complained of.

Specifications 8 and 9, alleging error in denying defendant's motion for a new trial and entering judgment, are disposed of in deciding the merits of the other assignments.

For the reasons herein stated, we recommend that the judgment of conviction and the order denying a new trial be affirmed.

PER CURIAM: For the reasons given in the foregoing opinion, the judgment of conviction and the order denying a new trial are affirmed.

*Affirmed.*

