STATE, Respondent, *v.* ELMORE, Appellant.

No. 9183.

Submitted May 14, 1952. Decided August 16, 1952.

247 Pac. (2d) 488.

Mr. F. F. Haynes, Forsyth, Mr. Raymond Shelden, Ekalaka, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Thomas F. Joyce, Asst. Atty. Gen., Mr. Roy W. Holmes, County Atty., Ekalaka, for respondent.

Mr. Shelden, Mr. Joyce and Mr. Holmes argued orally.

MR. JUSTICE BOTTOMLY:

The defendant, Henry Elmore, was convicted of the crime of grand larceny, alleged to have been committed by him in Carter county by feloniously stealing, taking, carrying and leading away one red steer, branded RM on the left ribs, the property of Ray Martin. Defendant appeals from the judgment of conviction and order denying his motion for a new trial.

It is contended by defendant that the evidence is insufficient to justify the verdict; that the verdict is contrary to the evidence; that the verdict is contrary to law; that the evidence is insufficient to support the judgment; that the court erred in admitting in evidence over defendant's objection, state's exhibit 2, being a steer hide branded RM on left ribs; that the court erred in giving, over defendant's objection, instruction No. 13 and that the court erred in denying defendant's motion for a new trial.

The record discloses that the recorder of marks and brands for the state of Montana, on July 7, 1948, issued to Ray Martin

the brand RM for cattle left ribs. The cattle, including the Brahma or Brahma-cross, bearing this brand are all owned by the Sleeper Martin Cattle Company. These cattle were run and ranged on the Trail Creek Cattle Company's lands, situated approximately 45 miles northwest of Ekalaka in both Carter and Custer counties.

State's witness Doris Willson testified that she was in Ekalaka June 19, 1951; that at between 12:30 and a quarter of one a. m. on the 20th day of June, her sister Nancy Holly drove her to her ranch home located some 21 miles south and west of Ekalaka in Carter county in the latter's Pontiac club coupe. At approximately 10 miles from Ekalaka at the foot of Stoltenberg hill a green Studebaker pickup truck, driven by defendant passed them; at that time they were traveling at about 20 miles per hour and defendant's speed was 25 to 30 miles; that they followed defendant for a mile or so at a speed of 60 to 65 miles per hour; that they kept within 70 to 75 feet of the truck for a mile or so; that they observed in the box of the pickup a red beef, a Brahma or Brahma-cross.

She testified there was a fence post on each side of the beef and a tarp that had blown up or off the beef; that she knew it was the carcass of that type of animal; that the lights of their car were on the truck box; that they saw no white on the beef; that it had the characteristics of a Brahma-cross; that such breed have short, slick hair. The testimony of state's witness Nancy Holly was in substance the same as her sister's; that the beef in the truck box had the characteristics of the Brahma breed of cattle and both were positive.

The testimony of Doris Willson and Nancy Holly is the only evidence of the asportation of a beef carcass by the defendant.

Sheriff Peabody and stock inspector Henry Beason went to defendant's ranch June 21, 1951, where they found a right hind quarter of beef and defendant's wife engaged in canning meat. Thereupon the sheriff and Beason searched the premises for a hide. The defendant asserted that the beef was his but refused to exhibit the hide, stating that he had butchered the beef out

on the Gumbo which was out on the C & B grazing unit of Taylor grazing land.

The sheriff then took into his possession the quarter of beef, most of the canned meat as well as the bones, heart and liver. On that same day Beason filed a complaint in the justice court charging defendant with refusing to exhibit the hide of slaughtered beef and upon the warrant therein issued the sheriff arrested the defendant and on June 25th defendant appeared in said justice court and admitted that he had refused to exhibit the hide for his beef. Thereupon the justice court found defendant guilty and assessed a fine of $250 which defendant paid. The sheriff returned to defendant the canned meat and the quarter of beef on June 25, 1951.

On June 27, 1951, defendant exhibited to the sheriff a hide and a bill of sale whereupon the sheriff tagged the hide, took up the bill of sale, and delivered to defendant a beef inspection certificate therein describing the hide as green and designating the sex of the animal from which it was taken as a heifer.

Eight year old Jerry Hawkins, a witness for the state, testified that on June 21st while rounding up cattle he rode up a draw on the south side whereof there is a gate; that at that time he saw a man on a sorrel horse ride up out of the draw and that the man had something on behind his horse. The county attorney stated that the record might show that the object was about two and a half feet by seventeen inches in diameter. The witness also testified that he asked the man where he was going and was told he was going to look at his wheat field; that the wheat field was south of the gate; that when the man was shutting the gate his horse was turned north and that the man got on his horse and it was turned north and that the witness saw him no more. He identified the defendant in court as the man he had seen.

About a quarter of a mile north of the aforesaid gate, on land owned by Odis Hawkins, the father of the witness, there were certain wells, same being located about three miles northwest of defendant's ranch.

On June 29, 1951, the sheriff found a beef hide in one of

██ said wells on the Odis Hawkins place. The hide was a green hide which had begun to sour and on which the hair had started to slip. The sheriff testified that the hide bore an RM brand on the left ribs; he thought it had been recently butchered.

Nat Gunnar, witness for the state testified that he was the foreman of the Trail Creek Cattle Company and the Sleeper Martin Cattle Company; that the hide bore the brand RM on left ribs and that the hide was from a Brahma male; that it would be impossible for him to say whether the hide was from a bull or a steer. The hide had been placed in formaldehyde. At the time of the trial the hide was badly shrunken and much of the hair had been lost off of it.

In regard to the quarter of beef the sheriff had taken from defendant and returned to defendant before he found the hide the sheriff testified:

"Q. Now Bob, referring you back now to the right quarter, I guess it was the right quarter of beef? A. Yes.

"Q. That you brought into Ekalaka here from the Elmore ranch, after you got this beef here did you take it down to the locker plant? A. That is right.

"Q. And did you while the beef was there look at it? A. Yes.

"Q. Did you go in a couple of times and look at it? A. Yes, I was in there a couple times, three times, I think.

"Q. Did you observe it very closely? A. Yes, I did.

"Q. Later on did you take the beef, the quarter of beef back to the Elmore ranch? A. That is right.

"Q. Take all the canned goods back to the Elmore ranch? A. Yes.

"Q. Now from your observation of that beef, from previous experiences that you have had as a rancher particularly in the butchering of meat could you tell the sex that that quarter of beef came off of? A. Yes, I believe I could.

"Q. What sex did it come off of? A. I believe it was a steer.

"Q. Now how did you tell that? A. Well, it's just the

nature is all, the steer pelvis bone is smaller opening than a female.

"Q. What? A. In the female the pelvis bone is larger than it is on the male.

"Q. And about how big around was the pelvis bone in this animal? A. Well the opening in there was approximately 3½ inches.

"Q. You also saw the hide, did you not? A. That is right.

"Q. And examined that carefully? A. That is right.

"Q. You likewise had the quarter of beef, did you not? A. That is right.

"Q. And examined that carefully? A. That is right.

"Q. You likewise had the quarter of beef, did you not? A. Yes.

"Q. And you examined it very carefully? A. That is right.

"Q. Is that right? A. That is right.

"Q. Now the quarter of beef, as I understand it, was the right hind quarter, is that right? A. That is right.

"Q. Well, I will ask you this, after your examination of both of them, would the right hind quarter of beef fit the right hind quarter of the hide that was found in the well out at Elmore's? A. Yes.

"Q. Another question, Bob, have you in your inspection of this quarter of beef that was in here that you had, and had these opportunities to examine it, and did examine it as you say, could you tell from what type of animal that was from? A. Well, I'd say it was either from a Brahma or some other lighter boned type of cattle that this came from."

As will be noted, the sheriff never had the hide which he recovered from the well and the quarter of beef he took from defendant together at any time.

We believe that the evidence submitted relative to the hide was clearly not of the compelling and conclusive character necessary and was insufficient to connect the defendant therewith and therefore defendant's objection to its introduction in evidence should have been sustained.

238

The ownership of the alleged steer was not proven as ▮▮▮▮ alleged.

This court in State v. Moxley, 41 Mont. 402, 408, 110 Pac. 83, 85, Chief Justice Brantly speaking, said: "In larceny it is necessary that the charge identify the offense by a description of the things stolen, and their ownership." Where an information alleges the ownership of the property, it follows that the ownership must be proved as charged. Here the charge is that the steer, branded $\overline{RM}$ on the left ribs, was the property of one Ray Martin. State witness Nat Gunnar, manager of the Brahma and other cattle carrying the $\overline{RM}$ brand, testified:

"Q. You say that the cattle are in the name of the Sleeper Martin Cattle Company? A. Sleeper Martin Cattle Company.

"Q. What brand do they run? A. Well the Brahma are under $\overline{RM}$.

"Q. Who do the Brahma belong to? A. Sleeper Martin Cattle Company.

"Q. Where do these cattle run? A. Well they run on the Trail Creek Cattle Company range which is about 45 miles northwest of here.

"Q. And is that in two counties? A. Yes, sir."

It is to be noted that the brand $\overline{RM}$ was issued to Ray Martin, an individual. Proof of a brand only is not sufficient proof of the ownership of an animal bearing such brand.

Neither the owner or owners of the alleged stolen steer testified in the case. Mr. Gunnar nor any other witness stated that the Sleeper Martin Cattle Company had lost a steer so branded or any other kind of cattle.

The corpus delicti may be proved by circumstantial evidence ▮▮▮ in a larceny case, but in such a case the essential fact or facts must be established beyond a reasonable doubt by evidence of the most cogent and irresistible kind. The evidence in this record connecting the defendant with the hide and the asportation of a live steer in Carter county amounts to no more than suspicion and conjecture and is far from cogent and irresistible

and does not meet the test. Compare State v. Woolsey, 80 Mont. 141, 158, 259 Pac. 826.

As was stated by Chief Justice Brantly in State v. Keeland, 39 Mont. 506, 512, 104 Pac. 513, 516: "The statute (Rev. Codes, sec. 8645 [of 1907]) [now R. C. M. 1947, sec. 94-2704] declaring the stealing of any of the animals named therein, including heifers, to be grand larceny, refers to live animals of whatever value. Under the charge in the information, therefore, the defendants could not be convicted of a larceny of the beef, no matter what its value may have been." See Powe v. State, 146 Tex. Cr. R. 346, 175 S. W. (2d) 78, 79.

There is in this case a serious lack of evidence that the alleged crime was committed in Carter county. Beef was found in Carter county at defendant's home. A hide was found in a well some three miles from defendant's home on the property of a neighbor in Carter county. The defendant was arrested in Carter county. However, the surrounding circumstances about which there is no dispute show that the carcass of a beef had been brought from elsewhere to the defendant's home. This is all of the evidence tending to show the locus of the alleged crime. Here it is admitted the cattle bearing the brand $\overline{RM}$ on the left ribs, range in Carter and Custer counties. As was said in the Keeland Case, supra: "It is a matter of common knowledge that cattle range widely, paying no attention to county [as in this case] or state lines. While the cattle of Mr. Bean may customarily have ranged near his ranch house, along East Redwater creek, this does not tend to show that they did not often stray away to great distances and cross the county lines of adjacent counties or the state line into Dakota on the east. The venue must be proved beyond a reasonable doubt, just as any other fact."

This court realizes that with the present swift methods of transportation and the wide stretches of the range country, the livestock industry faces wily and resourceful rustlers. To meet this challenge the state may adopt modern methods of

crime detection. However, under our Constitution, our statutes and decisions, a defendant is entitled to a fair trial. This court has long been committed to the principle that, " 'A defendant may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes [his] guilt beyond reasonable doubt' ". State v. Woolsey, 80 Mont. 141, 158, 259 Pac. 826; State v. McCarthy, 36 Mont. 226, 92 Pac. 521; State v. Riggs, 61 Mont. 25, 201 Pac. 272, 280.

A conviction can stand only upon proof of material facts which logically compel the conviction that the charge is true. See State v. Gilbert, Mont., 246 Pac. (2d) 814, and cases cited therein.

For the foregoing reasons the judgment and order are reversed, with directions to the district court to grant defendant a new trial.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES METCALF, FREEBOURN and ANGSTMAN, concur.