THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
PAUL BARICK, DEFENDANT AND APPELLANT.

No. 10560.
Submitted November 5, 1963. Decided January 24, 1964.
Rehearing denied February 24, 1964.
389 P.2d 170.

Seth F. Bohart (argued), Bozeman, for appellant.

Jack D. Shanstrom (argued), Byron L. Robb (argued), Livingston, Forrest H. Anderson, Alfred B. Coate (argued), Helena, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

Defendant, Paul Barick, was convicted in the district court of the crime of burglary in the first degree and was thereupon sentenced to serve a term of eight years in the state penitentiary. From this verdict and judgment he appeals.

The information charged that the defendant "on or about the 4th day of October, A.D., 1960, committed the crime of Burglary, in that the said Paul Barrick [sic], then and there being, then and there did, wilfully, unlawfully, feloniously, intentionally, and burglariously, with the intent in him, the said Paul Barrick [sic], then and there and therein, to commit larceny, enter into that certain building commonly known as Cardinal Distributing Company, * * * in Livingston, Montana * * *."

Defendant was, at the time of the crime, a highway patrolman.

Before this case went to trial defendant moved the district court for a change of venue. In support of this motion five affidavits were submitted wherein each affiant stated that they were of the opinion that defendant could not receive a fair and impartial trial in Park County upon the ground that the question of defendant's guilt or innocence had been predetermined. In addition to the foregoing affidavits, counsel for defendant filed his petition and affidavit for a change of place of trial. The State in opposition to defendant's motion filed the affidavits of twenty-four persons, and in addition offered testimony of six persons. At the conclusion of the hearing on the motion for change of venue the court took the matter under advisement. Five days later defendant moved the court to reopen the hearing on the motion for change of venue to hear

additional testimony in support of defendant's motion. This consisted of testimony to the effect that the wife of a Deputy Sheriff had gone to the partner of one of defendant's affiants and stated that her husband was so angry because of the affiant's act of signing the affidavit for defendant, that she was no longer to trade with them. Defendant claimed this was evidence of the public prejudice against him and shows how difficult it was for him to induce persons to sign affidavits in his behalf. After hearing this testimony, the court again took the motion under advisement. On October 1, 1962, the court made its order denying the motion of defendant, for an order changing the place of trial in this action.

There is little dispute as to the facts of the crime having been committed. In the first hours of October 4, 1960, Akira Shimura, the Japanese watchman at the Cardinal Distributing Company plant, was aroused by noises emanating from that Company's warehouse. Mr. Shimura resided on the premises. He proceeded to investigate and discovered an automobile had been backed into the building. He looked into the car, which had the dome light and radio on, and discovered that five or six cases of Lucky Lager beer had been loaded into the back seat. He also noticed that the word "POLICE" was painted on the trunk of the car. Immediately after these observations Mr. Shimura was startled by a man appearing, from seemingly out of nowhere, about two or three feet from him. He asked him what he was doing but no reply was made. There then was a short colloquy whereupon the intruder then stood mute for some time until he said, according to Mr. Shimura, "Paul come here, that's all right, everything all right," or words to that effect. Mr. Shimura then left to call Chan Libbey, the owner of the business. When he returned to the interior of the warehouse the automobile and all of those that might have been there were gone.

Chan Libbey arrived soon after, immediately followed by a police cruiser containing Patrolman T. C. Adams. Upon inves-

tigation Mr. Libbey ascertained that six cases of Lucky Lager beer were missing from his stocks. There was ample evidence that the building had been entered and that a vehicle had been moved through the doors.

These events concerning the commission of the crime were admitted in the trial by two of the professed burglars; T. C. Adams, the policeman who investigated the crime, and an off-duty policeman, Fred Williams. Their stories are almost identical. The facts elicited from them show that they were riding around Livingston with the defendant, Paul Barick, during the evening of October 3, and the early morning hours of October 4, 1960, in the police cruiser belonging to that city. This activity seems to have been the common practice. Adams was on duty, but Williams and the defendant were not. They noticed a door ajar on the Cardinal Distributing warehouse. A common plan or design was then formulated whereby they decided to take some of the stored beer. The stories told by the two ex-policemen then go on to relate how they all entered the warehouse; how Adams returned outside and the door being locked by those on the inside; how Adams then drove the cruiser to the west side of the warehouse whereupon the large doors located there were opened and the vehicle backed in. The beer was then loaded and they went to look at some glassware stored in another place. It was at this point they heard Mr. Shimura coming in search of them, so they hid.

Adams testified that after talking to Mr. Shimura he "hollered out, well, ['] Paul, here he is ['']." Williams testified that he heard Adams call out, "['] Here, Paul, he is over here ['], or [,'] they are over here ['], or something relative to that."

Williams and Adams both confirm Mr. Shimura in that when he went to the phone they all fled. Adams drove the police car out of the building and the two others jumped in. They then stated they drove to where defendant had parked his car and transferred the beer to that vehicle. Adams then proceeded

to answer a burglary call, concerning a break-in at the Cardinal Distributing Company, he received over the short-wave radio. Williams testified that he and the defendant drove around in defendant's car until Adams returned whereupon they "decided that we better get rid of the beer fast like and we drove over to the city water works next to the river and drove down next to the bank and threw it [the beer] in the river."

At no time was Mr. Shimura able to identify the person to whom he had talked, yet his testimony and the stories Williams and Adams related mesh remarkably well. All three persons note that the name "Paul" was used at the time of the event.

Billy G. Smith, a former policeman for the city of Livingston, was a witness for the State. In the aftermath of the police scandal in that city, Smith was charged with two counts of receiving stolen property. These charges, however, were dismissed when he plead guilty to having perjured himself before the Grand Jury. Smith testified, in this case, that in March of 1961 he had a conversation with the defendant, in defendant's Highway Patrol car, on the highway south of Livingston. His testimony is as follows:

"Q. What was the discussion that took place at that time between you and Mr. Barick? [Objection made and overruled. The question was repeated.] A. Mr. Barick and myself had been both before the Grand Jury. We discussed what had taken place and we both were there, what they asked him and what they asked me.

"Q. And while you appeared before the Grand Jury had you been questioned about the Cardinal Distributing job? A. Yes.

"Q. Did Mr. Barick make any statement to you at that time regarding the Cardinal Distributing job? A. Yes, he did. [Objection made and overruled.] A. Yes, he did.

"Q. What was that statement? A. That after going through the Grand Jury of anything [,] he believed [,] he had to worry about was the beer job, Cardinal Distributing plant.

\* \* \* \* \*

"Q. Did he [defendant] state why he was worried? A. Yes.

"Q. And what was that? A. That his name was called by Mr. Adams during the time that they were in the building.

"Q. Subsequent to this meeting south of Livingston did you ever discuss this Cardinal Distributing incident any further with Mr. Barick? A. Yes.

      *    *    *    *    *

"Q. When was that? A. During October of 1961.

      *    *    *    *    *

"Q. And what statement was made by Mr. Barick at that time in regards to the Cardinal Distributing job? [Objection made and overruled.] A. Again he stated that was the only thing he had to worry about was the Cardinal beer job."

At the close of the State's evidence, the defendant by his counsel moved the court to dismiss the information upon the ground of insufficiency of the evidence. This motion was denied by the court.

Defendant has alleged the following specifications of error:

"1. The Court erred in denying Appellant's Motion for a Change of Venue;

"2. The Court erred in denying Appellant's Motion for dismissal of the Information at the close of the State's case;

"3. The Court erred in denying Appellant's Motion for a New Trial * * *."

█ Considering defendant's first specification of error based upon the order denying defendant's motion for change of venue, we cannot find where the court below abused its discretion.

The affidavits presented in behalf of and on defendant's motion followed the mandates of R.C.M.1947, § 94-6901, faithfully. However, we do find one paramount theme running throughout each and every affidavit so presented. Each affidavit states that "he [the affiant] is *of the opinion* that the Defendant * * * cannot receive a fair and impartial trial * * *

upon the grounds that * * * people * * * have already formed fixed and definite opinions as to the guilt or innocence of the Defendant." Emphasis supplied. As for such opinions this court has said in the case of Territory v. Manton, 8 Mont. 95, 103, 19 P. 387, "This affidavit does not state a single fact. It simply states the opinions of the witnesses from what they have heard." There was no compelling evidence presented by defendants to show that the contentions made were in fact such as should move the discretion of the court. The affidavit of defense counsel concerning the alleged threat to one of the above affiant's partner wherein he say it "is proof in itself that public feeling in Park County, Montana, is so antagonistic against the Defendant that the numerous persons heretofore contacted for the purpose of executing Affidavits in support of Defendant's Motion for Change of Venue had real and genuine cause to fear criticisms of themselves or damage to their business if they should sign such Affidavits" is also nothing but his opinion. That event appears to have been an isolated case. It is easy to see and appreciate the facts of that situation. Here was one policeman reacting to a series of events that cast the shadow of doubt over all law officers in that area of the State. The fact that someone disagrees with the propriety of the affiant and thereafter refuses to do business with them is hardly in itself grounds to change the place of trial. The court below had all these facts before it and we cannot, from the record, find any abuse of discretion.

The five aforementioned affidavits further alleged that certain newspapers had given a great amount of publicity to the entire police scandal in the Livingston area. However, no specific copies of those newspapers were submitted as evidence. Allegations alone, of this nature, are insufficient to move the discretion of the court. "The bald statement that the tale of the crime was printed in newspapers and generally read by the inhabitants of the county, and that therefore the defendant would be deprived of his constitutional right of fair trial

by an impartial jury, is a flat conclusion, and was properly disregarded by the trial Court." State v. Davis, 60 Mont. 426, 431, 199 P. 421, 422; See State v. Dryman, 127 Mont. 579, 589, 269 P.2d 796; State v. Board, 135 Mont. 139, 143, 337 P.2d 924.

This court recognizes, as appellant argues, that there were changes of venue allowed in some of the other trials concerning the Livingston police scandals. But this in no way precluded the trial court from denying, in any individual case, a motion for change of venue.

There is nothing in the record which leads to the conclusion that there was ever any difficulty in finding and picking a jury in this case. See State v. Davis, supra, 60 Mont. at page 432, 199 P. at pages 422-423.

From the facts and affidavits presented we can find no reason to believe there was an abuse of discretion or that this defendant was materially prejudiced in the trial below because of a refusal to allow a change of venue.

Defendant's second specification of error as quoted is as follows: "The Court erred in denying Appellant's Motion for dismissal of the Information at the close of the State's case."

Defendant's third specification of error as quoted is as follows: "The Court erred in denying Appellant's Motion for a New Trial [listing various grounds]."

Both of these quoted specifications of error are argued together in defendant's brief. They are interwoven with the basic contention that the State did not produce sufficient credible evidence or testimony to either: (1) go to the jury, or, (2) sustain the verdict. Because of these facts these specifications of error will be handled as one.

The facts of this case leave no doubt that a crime had been committed. This only leaves the question open as to whether the evidence was sufficient, as a matter of law, to show that this defendant was a party to the commission of that crime.

If in fact defendant is guilty of the crime charged, Adams and Williams were his accomplices. This court over the years

has had much to say about the testimony of an accomplice while interpreting R.C.M.1947, § 94-7220. State v. Moran, 142 Mont. 423, 384 P.2d 777, 792; State v. Laverdure, 140 Mont. 236, 240-241, 370 P.2d 489; State v. Harmon, 135 Mont. 227, 237-238, 340 P.2d 128; State v. Cobb, 76 Mont. 89, 92, 245 P. 265, 266; State v. Geddes, 22 Mont. 68, 82-83, 55 P. 919. This statute says: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

Accomplices are not precluded from testifying in criminal cases in Montana. R.C.M.1947, §§ 94-7220, 94-8803, 94-8804, 94-8801, 93-701-1, 93-701-2, 93-701-3, 93-701-4.

The fact that accomplices are convicted felons at the time of their giving testimony does not detract from their competency as witnesses. R.C.M.1947, § 94-4723.

Therefore, we are only concerned with that portion of section 94-7220 which says "* * * unless he [the accomplice] is corroborated by other evidence, *which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense;* * * *." Emphasis supplied.

The sufficiency of the corroboration necessary, to sustain a conviction based upon accomplice testimony, is a matter of law. State v. Moran, supra, at page 792 of 384 P.2d; State v. Cobb, supra.

The question of one accomplice corroborating another is not before this court at this time.

Our only question is whether there was sufficient testimony and/or evidence "which in itself, and without the aid of the testimony of the accomplice, *tends to connect* the defendant with the commission of the offense; * * *." Emphasis supplied.

We hold that as a matter of law there was sufficient corroboration.

The facts that defendant habitually rode in the police car; that the name "Paul" was heard by the watchman; that a car bearing the word "POLICE" on its trunk was seen in the burglarized building; and that defendant was a good friend of the confessed burglars, do not in themselves furnish sufficient corroboration. Individually and collectively they are nothing more than suspicious circumstances. However, once evidence is found that "tends to connect" this defendant with the commission of this crime, these suspicious circumstances augment the reasonableness of the jury's verdict.

Evidence which "tends to connect" is that evidence which taken by itself leads to the inference, not only that a crime has been committed, but the prisoner is implicated in it. State v. Geddes, supra, 22 Mont. at page 83, 55 P. at page 924. R.C.M.1947, § 93-1301-2, defines an *inference* as "a deduction which the reason of the jury makes from the facts proved, without an express direction of the law to that effect." R.C.M. 1947, § 93-1301-4, states:

"An inference must be founded:

"1. On a fact legally proved; and,

"2. On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature."

An inference is to be distinguished from mere *suspicion* which is defined as "the act or an instance of suspecting: imagination or apprehension of something wrong or hurtful without proof or on slight evidence; * * *." Webster's, New International Dictionary (3rd ed. 1961).

The corroboration necessary was furnished by defendant himself in his statements to the convicted perjurer Smith. Defendant admitted that "of anything * * * he had to worry

about was the beer job, Cardinal Distributing plant" and that he was worried "That his name was called by Mr. Adams during the time that *they* were in the building." Emphasis supplied.

■■ " 'Corroborating circumstances may consist of any acts, conduct, or *declarations* of the defendants * * *.' " Emphasis supplied. State v. Stevenson, 26 Mont. 332, 336, 67 P. 1001. "* * * *all admissions are usable against the accused in a criminal case* * * *.*" 4 Wigmore, Evidence, § 1050, p. 7 (3rd ed. 1940). The admissions of defendant are sufficient corroboration if they *tend to connect* him with the commission of the offense. 7 Wigmore, Evidence, § 2059, pp. 325-327 (3rd ed. 1940); 2 Wharton, Criminal Evidence, §§ 462, 466, pp. 249 and 255, respectively (12th ed. Anderson 1955); See State v. Duran, 127 Mont. 233, 236, 259 P.2d 1051; State v. Cobb, supra. Although these admissions of defendant would not be sufficient by themselves to convict or to even make out a prima facie case they do tend to connect this defendant with the commission of this offense. Furthermore, the court gave defendant's proposed instruction number 8, as court's instruction number 23, which was a verbatim restatement of R.C.M.1947, § 93-2001-1, subd. (4), which states: "That the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution." We must assume the jury weighed the evidence with this instruction in mind.

However, defendant in his motion to dismiss the information, asserts that "The testimony of an admitted convicted perjurer is not credible or believable evidence." He continues this line of argument upon appeal.

■■ At the common law one convicted of perjury could not testify. 2 Wigmore, Evidence, §§ 519, 520. Although in most states the incompetency of convicted felons has been removed, the states "usually retain the common law rule for perjury only (including subornation); * * *." 2 Wigmore,

Evidence, § 524. However, such is not the rule in Montana. Even a convicted perjurer is a competent witness. See R.C.M. 1947, §§ 94-8801, 93-701-1, 93-701-2, 93-701-3, 93-701-4. There is nothing in the above-mentioned statutes which would impose such a disqualification. The fact that testimony is received from a convicted perjurer does not concern competency but only credibility. Credibility lies within the exclusive province of the jury. R.C.M.1947, § 93-401-4; State v. Gunn, 89 Mont. 453, 465, 300 P. 212.

This court cannot find that the witness Smith was an incompetent witness, nor that his testimony was rendered so weak as would destroy it as legal evidence. However, we do find that it was sufficient to connect and corroborate the testimony of the two accomplices.

Within the third specification of error, defendant contends that the court erred in giving State's proposed instruction number 7 instead of defendant's proposed instruction. The instruction given became Court's instruction number 8. The instruction given read: "You are instructed that the defendant may not be convicted on conjecture, however shrewd, or suspicion, however justified, or probabilities, however strong, but only upon evidence which establishes guilt beyond a reasonable doubt." It is the contention of defendant that the period after the word "doubt" should have been replaced with a semicolon and the following words added: *"that is upon proof such as to logically compel the conviction that the charge is true."* Emphasis supplied.

In State v. Elmore, 126 Mont. 232, 240, 247 P.2d 488, this court approved the instruction given. The court also tacitly approved the defendant's proposed instruction in State v. Fairbanks, 140 Mont. 243, 247, 370 P.2d 497.

The addendum sought by defendant is nothing more than a short and rather inadequate further explanation of "reasonable doubt." The trial court instructed the jury as to reasonable doubt and the defendant's presumption of innocence. The

allowance or denial of this phrase would not materially affect the rights of this defendant when all of the instructions were read together. See State v. Curtiss, 114 Mont. 232, 244, 135 P.2d 361.

Defendant further alleges error in the court giving that portion of instruction number 11, which is italicized below.

"All questions of fact are to be decided by the jury; all evidence is addressed to them; the court does not intend in any instruction given to intimate as to how you shall find on any question of fact; on the other hand, all questions of law are to be determined by the court, and you are not at liberty to disregard the law as given you by the court in these instructions, or to hold as law any thing other than that given you in the instructions.

"*The court instructs the jury that in determining what facts are proven in this case, you should carefully consider all the facts before you with all the circumstances of the transaction in question, as detailed by the witnesses; and you may find any fact proven which you may believe may be rightfully and reasonably inferred from the evidence given in the case, although there may not be any direct testimony as to such facts.*"

Defendant contends that this portion of the instruction "defeats and contradicts the law requiring the State to prove a defendant's guilt beyond a reasonable doubt, and it further allows the jury to weigh the evidence under the rule applicable in civil cases, and having so weighed it, and ascertained on which side the scale preponderated, to decide the case accordingly, and is a contradiction of the law and the instruction of the Court that no defendant may be convicted upon conjecture, however shrewd, on suspicion, however justified, or probability, however strong, but only upon evidence which establishes his guilt beyond a reasonable doubt."

The instruction only provides that "facts" can be found through inferences, not that a conviction can be based upon the

same. To follow the contention promoted by defendant would lead this court to the position that no conviction could ever be sustained based upon circumstantial evidence. Our law requires the jury to be the judge of the facts presented during the course of the trial. R.C.M.1947, §§ 93-2001-1, 94-7236. In arriving at the ultimate fact, the jury may make logical inferences from the facts which are proved. See State v. Blaine, 45 Mont. 482, 485, 124 P. 516. It is stated in 88 C.J.S. Trial, § 277, p. 748: "The propriety of an instruction that the jury may draw reasonable and natural inferences from the facts proved to their satisfaction has, however, been recognized, and although there is authority to the contrary, *the court may properly charge that the jury may find any fact proved which they think rightfully and reasonably inferable from the evidence.*" Emphasis supplied. See R.C.M.1947, §§ 93-1301-3, 93-1301-4. It is further stated in 53 Am.Jur., Trial, § 186, p. 159: "It is the province of the jury to find not only the facts, but also the inferences fairly deducible therefrom."

Defendant further predicates error in the court's instruction number 31. This instruction defined "larceny" in the words of the statute. Defendant contends that "This Instruction is a definition of larceny and is not applicable in a case where the charge is burglary."

The court's instruction number 30, which was received without objection, stated that "Every person who enters any * * * warehouse * * * with intent to commit grand or petit *larceny,* or any felony, is guilty of burglary." Emphasis supplied.

One of the elements of the crime of burglary is the larcenous or felonious intent of the actor. The intent necessary is a specific intent. Therefore, it behooves the court to define that which constitutes the act manifesting that intent.

We can find no error in the instructions as given.

Finding no error in the record, the judgment is affirmed.

288

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, JOHN CONWAY HARRISON and DOYLE concur.