FILED

10/11/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0217

DA 21-0217

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 195

JULIE KOSTELECKY, an individual, on behalf
of herself and her minor child S.M.K.; and
JASON KOSTELECKY, an individual, on behalf
of himself and his minor child S.M.K.,

        Plaintiffs and Appellants,

   v.

PEAS IN A POD LLC; LACEY ALLEN; ERICA
WILLIAMS; JANE AND JOHN DOES 1-10,

        Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighteenth Judicial District,<br>In and For the County of Gallatin, Cause No. DV-18-1249B<br>Honorable Rienne McElyea, Presiding Judge |

COUNSEL OF RECORD:

       For Appellants:

              John L. Amsden, Michael G. Black, Anthony F. Jackson, Beck Amsden &
              Stalpes, PLLC, Bozeman, Montana

       For Appellees:

              Ross D. Tillman, Zach A. Franz, Boone Karlberg P.C., Missoula, Montana

                       Submitted on Briefs:  February 16, 2022

                            Decided:  October 11, 2022

Filed:

_____
                  Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Jason and Julie Kostelecky (Kosteleckys) appeal the April 2021 judgment of the Montana Eighteenth Judicial District Court, Gallatin County, granting defendants Peas in a Pod, LLC, Lacey Allen (Allen), and Erica Williams (Williams) summary judgment on Kosteleckys' various negligence-based tort, breach of contract, and Montana Consumer Protection Act (MCPA) claims. We address the following restated issues:

1. *Whether the District Court erroneously granted summary judgment to Defendants on the causation element of Kosteleckys' negligence-based tort claims?*

2. *Whether the District Court erroneously granted partial summary judgment to Defendants on Kosteleckys' asserted breach of contract claim?*

3. *Whether the District Court erroneously granted partial summary judgment to Defendants on Kosteleckys' asserted MCPA claim?*

We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

¶2 In December 2015, defendants Allen and Williams began operating a child day care service (Peas in a Pod Daycare) in Belgrade, Montana, under a provisional Montana Department of Health and Human Services (MDPHHS) license.[1] The license authorized them to provide day care for up to 12 children, including six children under the age of two years old. After obtaining full licensure in March 2016, Peas in a Pod soon began running

---

[1] MDPHHS licenses and regulates temporary child day care operations under Title 52, chapter 2, part 7, MCA, and Admin. R. M. Title 37, chapter 95.

at or near full licensed capacity, with typically 10-12 children in attendance each day.[2] Though Allen and Williams were the only licensed caregivers, they had two unlicensed "helpers"—Williams' adult sister and a 17-year-old high-school student (Madi Acuff) who was the girlfriend of Allen's younger brother. *Inter alia*, the 17-year-old "helper" assisted in the feeding and care of infant attendees including Kosteleckys' daughter, S.M.K.

¶3 Kosteleckys started their first daughter at Peas in a Pod in Spring 2016. Later that summer, they began pre-paying to reserve an additional space for a newborn expected later that year. Following her birth in September 2016, S.M.K. started part-time day care at Peas in a Pod while Julie Kostelecky (Mother) was still on maternity leave. Upon expiration of Mother's maternity leave, S.M.K. started full-time day care at Peas in a Pod on December 7, 2016.

¶4 According to Allen and Williams, S.M.K. was often "fussy" and sometimes ate very little or not at all. Allen and Williams were thus in frequent contact with Kosteleckys regarding S.M.K. At their request Jason Kostelecky (Father) often came to the day care to feed S.M.K. when she would not accept a bottle from Peas in a Pod personnel.

¶5 On December 22, 2016, Mother received a text message from Allen at 4:44 p.m. advising that S.M.K. had been "really upset all day," "refus[ed] to take a bottle" from Allen or her "helper," and that Allen was "starting to wonder if she is sick because we can't do anything to comfort her." Allen later testified that the child had been "screaming all day"

---

[2] Usual attendees included Allen's own infant son, *inter alia*.

3

but that she did not contact Mother until late in the day because she "didn't know what to do" to comfort S.M.K.[3] Father picked up S.M.K. around 5:00 p.m. and took her to the Belgrade Urgent Care Clinic based on Kosteleckys' speculation that she might be suffering from an ear infection. At the Urgent Care, Dr. Karen Krutchick examined S.M.K. and noted that she was "well-developed, well-nourished, and in no distress." Upon further examination, the doctor noted, *inter alia*, that the child's head was "normocephalic and atraumatic," with a "flat" anterior fontanelle. The anterior fontanelle is a small opening in an infant's skull where the skull bones have yet to fully fuse together. Dr. Krutchick later explained that her observations meant that S.M.K.'s head was "of a normal shape," with no "bruises, . . . cuts, scrapes, . . . [or] indication of trauma." She added that the child's "flat" fontanelle was a reassuring sign of no medical problems, such as "swelling of the brain." Kosteleckys thus returned S.M.K. to day care the next day, December 23rd. Later in the day on December 23rd, however, Allen text-messaged Mother and advised that S.M.K. was again "pretty upset" and had thrown up during attempted bottle feeding. Mother picked up S.M.K. that afternoon. Due to the holiday break, she did not return to Peas in a Pod until January 3, 2017.[4]

---

[3] Allen also later testified, *inter alia*, that her 17-year-old helper was "trying to help her feed" S.M.K on December 22nd with Allen "sitting next to her" "the whole time." Williams recalled that the helper was trying to help Allen feed the child on the 22nd, but did not recall seeing her do so. The helper recalled trying to feed S.M.K on the 23rd.

[4] Peas In a Pod was closed for ten days from December 24, 2016, through January 1, 2017.

¶6     At S.M.K.'s regularly scheduled four-month wellness check on January 16, 2017, her primary care physician, Dr. Heather Kjerstad, MD, noticed that the child's head circumference had increased significantly since her two-month checkup and thus referred her to a Bozeman pediatrician (Dr. Mark Hodgson, MD) for follow-up examination and imaging. *Inter alia*, Dr. Kjerstad noted that "Mom reports fussiness," but that S.M.K.'s eating had improved since December 23rd and that the parents were aware of "[n]o known trauma" experienced by S.M.K.

¶7     Upon follow-up examination the next day, Dr. Hodgson noted S.M.K.'s increased cranial circumference and a "full[,] somewhat bulging," and "enlarged" anterior fontanelle. He noted that cranial ultrasound imaging indicated a layer of cerebral fluid between the child's brain and skull that was possibly "benign," but possibly not based on the degree of increase in her cranial circumference. Dr. Hodgson noted the parents were aware of "[n]o known head trauma," but that further "evaluat[ion] by pediatric neurology" was "likely" warranted. Following an exploratory MRI scan performed by a Bozeman radiologist (Dr. Gary Hedlund, DO) on January 18, 2017, S.M.K. was referred to the Primary Children's Hospital in Salt Lake City, Utah, for specialized pediatric neurological evaluation.[5] In the meantime, the child's primary care physician (Dr. Kjerstad) okayed

---

[5] The Intermountain Primary Children's Hospital is a non-profit pediatric hospital affiliated with the University of Utah School of Medicine. *See* https://intermountainhealthcare.org/primary-childrens/about.

S.M.K. to return to day care on January 19, 2017, which she did until January 24th before her parents took her to Salt Lake City for further examination.

¶8 At the Primary Children's Hospital in Salt Lake City on January 26, 2017, various medical personnel examined and evaluated S.M.K., chiefly a pediatric neurosurgeon, Dr. Douglas Brockmeyer, MD, FAAP.[6] Based on his personal examination of S.M.K.'s "increased head circumference and bulging fontanelles," and his review of her Bozeman MRI and radiology report, Dr. Brockmeyer issued a "Neurosurgery Report" to Dr. Kjerstad diagnosing S.M.K. with "bilateral subdural hematomas of *unknown etiology*." (Emphasis added.) The next day, January 27th, Dr. Brockmeyer surgically placed "bilateral subdural drains" to alleviate S.M.K.'s intercranial fluid buildup and pressure. However, "[a]fter the drains were removed, [her] subdural fluid collections unfortunately reaccumulated," causing her to become "irritable." Dr. Brockmeyer thus surgically placed a "right frontal subdural [drainage] shunt" in her skull on February 2, 2017, for ongoing drainage and later discharged her to her parents to return home. In his subsequent "Neurosurgery Report" to Dr. Kjerstad upon follow-up on July 6, 2017, Dr. Brockmeyer advised that:

> Since her discharge home she has done very well. She has been developing normally and currently has good control of her head and trunk movements per her parents' report. She has not been irritable and has otherwise been a very healthy and happy baby. Her parents currently have no concerns other than a curiosity as to when the shunt can be removed.

---

[6] Dr. Brockmeyer is a board-certified pediatric neurosurgeon, Professor of Neurosurgery, and Chief of the University of Utah Pediatric Neurosurgery Division. He operates a pediatric neurology clinic in association with the Children's Hospital. His professional experience includes, *inter alia*, treating 20-30 cases a year over 25 years involving alleged or suspected "shaken baby" syndrome.

6

. . .

I ordered and personally reviewed [a brain] MRI . . . today which demonstrates . . . [that] [t]he bifrontal subdural hematomas have markedly reduced in size [and] [t]here is . . . very minimal mass effect from the residual extra axial fluid collections. . . . Her fontanelle is flat. . . . At this time I am happy how she is progressing . . . [but] would recommend[] continuing the subdural [drainage] shunt for at least one year . . . [with reevaluation on additional MRI imaging thereafter]. . . . I counseled her parents there is no need for restriction of activity and that she should be treated as a normal baby . . . [unless further] symptoms intervene.

¶9 In August 2018, upon further MRI imaging and evaluation, Dr. Brockmeyer removed the subdural drainage shunt from S.M.K.'s cranium without complication. After returning to Montana with her parents, S.M.K. made a full recovery without any indication or likelihood of related physical or developmental problems in the future.[7]

¶10 In his subsequent August 2020 deposition testimony, Dr. Brockmeyer affirmed that the 2016 Bozeman MRI indicated that S.M.K. was experiencing "subdural hematomas" of "unknown etiology," consisting of the presence of blood and older blood proteins in a large accumulation of cerebral-spinal fluid between her brain and the interior of her skull. He explained:

Underneath [the skull bone,] that's the dura. And then there's another . . . thin layer that covers the brain called the [pia] arachnoid. . . . [T]he terms . . . describe the location of the [subject] fluid. . . . Subdural means that it's . . . underneath the dura but pressing on the brain, directly on the

---

[7] According to Dr. Brockmeyer and S.M.K.'s primary care physician, Dr. Kjerstad, S.M.K. continues to meet or exceed developmental milestones and will likely continue to develop normally and live a normal life. Dr. Kevin Joseph, a pediatric neurologist who independently examined S.M.K. in June 2020, concurred with the prognoses of Drs. Brockmeyer and Kjerstad and similarly opined that it is unlikely S.M.K. will experience future medical issues related to her January 2017 condition.

brain. . . . I'm trying to distinguish . . . that there's something else in the [cerebral-spinal] fluid that's created [the] subdural hematoma or subdural fluid collection . . . , and it's much different than just a normal situation. . . . [In addition to the normal cerebral-spinal fluid], [b]lood or protein . . . has escaped into that fluid around the brain.[8]

¶11 In regard to possible causes of S.M.K.'s subdural hematomas, Dr. Brockmeyer further explained, *inter alia*:

[There are] little bridging blood vessels that go from the surface of the brain to . . . the covering of the brain called the dura, and those blood vessels can sometimes tear and rupture and bleed into [that] fluid-filled space and . . . cause hematomas.

.   .   .

[S.M.K. is] a four-month-old baby, how does this happen? . . . [I]t could happen spontaneously. It could happen because she rolled over or some sort of benign act or just had a benign fall or whatever. Or . . . she could have had some sort of inflicted injury. . . . [T]hose are three broad, general categories.

.   .   .

It's either spontaneous or traumatic. . . . So the chance that one of these little . . . bridging veins rupture spontaneously, . . . I guess it's possible, [or maybe it was] just normal, everyday care, rolling over, sitting up, maybe . . . throw[ing] the baby up in the air because you are happy and the baby is happy[,] and all those kind of things. . . . [Y]ou have to put those

---

[8] A "subdural hematoma . . . is a collection of blood that accumulates inside the skull but outside the brain. The bleeding occurs within the layers of tissue that surround the brain . . . [and] collects under the brain's tough outer wrapper known as the dura. . . . Since the skull does not expand, any buildup of blood inside it can quickly put pressure on the brain." *See* Steven Senne, BSN, RN, *Subdural Hematoma (SDH): A Guide for Patients and Families*, Dept. of Neurosurgery, University of Michigan (2015) (available at https://www.med.umich.edu/1libr/neurosurgery /SDH.pdf). *See similarly* Cedars Sinai Academic Health Care Organization, Health Library ("[a] subdural hematoma is a buildup of blood on the surface of the brain . . . in a space between . . . the dura and the arachnoid [meninges] layers [between the brain and skull bone]") (available at https://www.cedars-sinai.org/health-library/diseases-and-conditions/s /subdural-hematoma.html).

scenarios on top of what the picture looks like inside the skull. . . . [T]here's a mismatch [between the space in her skull and the size of her brain.] [There is a] complex interrelationship between the brain rapidly growing over the first two or three years of age and the spinal fluid. [S]ome kids have lots of extra spinal fluid during that time period and they . . . just look like they have big heads. [I]t's very common and it's just benign. [Y]ou have the skull and you have the smaller brain in size, you have this fluid around in there, and many kids do just great. Can there be a spontaneous hemorrhage of some blood vessel that the blood escapes into the spinal fluid? I guess it's possible. That's debated endlessly and . . . almost impossible to prove.

The other alternative is that *some trauma*[,] . . . no matter how small or benign, caused it. [Like] a fall from a chair or changing table or being tossed casually on a pillow or . . . more sinister ones like being shaken, those are all possibilities for causing this type of problem. *So we don't know. Especially in this case*[,] *we don't know* . . . , but those are the two possible etiologies.

.    .    .

[As to whether the appearance of a symptom on a particular day means the cause occurred that day,] [n]ot necessarily[,] . . . there's so many variables to account for and extenuating circumstances . . . it's impossible to pin down.

.    .    .

[My medical note reference to an unknown etiology] [m]eans *I don't know what caused this.* . . . We talked about [potential causes] previously. [I]t could happen spontaneously. Maybe she rolls over while she's sleeping. . . . [S]pontaneously . . . impl[ies] that it just happened, all of a sudden [a bridging vein] just . . . broke on its own. All these other descriptions would imply that there's some sort of force or mechanism that could tear this little bridging vein. So there's really . . . very benign or innocuous causes to this, and then there's more sinister ones that could cause it like an inflicted injury. . . . [With a non-spontaneous subdural hematoma,] [s]ome sort of force was applied to the head that led to rupture of a blood vessel that caused the [foreign] fluid [in the cerebral-spinal fluid].

(Emphasis added.) He ultimately testified that the most likely cause of S.M.K.'s subdural hematomas was "some" unspecified type of "force or trauma," rather than a spontaneous rupture of a cranial blood vessel. He testified further, however, that he could not more

9

precisely determine the cause, source, or type of trauma involved, or whether it occurred accidentally or not. When questioned about a reference in S.M.K.'s medical history to possible child abuse, Dr. Brockmeyer testified that the "non-accidental trauma" reference was "unfortunate" because non-accidental trauma was only preliminarily "assumed" on intake under the initial circumstances, but "who knows?"[9] He clarified that, on a non-speculative basis, he could only say that the likely cause of S.M.K.'s subdural hematomas was "[t]rauma to some extent[,] . . . we don't know if [it was] accidental or not." Returning to the possibility of child abuse, Dr. Brockmeyer pointed out that physically abused infants typically exhibit some form or degree of retinal bleeding or damage, bone fractures, or other skeletal injuries. He further noted, however, that retinal and skeletal x-ray imaging and analysis conducted at Primary Children's Hospital in January 2017 manifested no indication of any such injury to S.M.K. Based on all of the available medical evidence, and the lack of any non-speculative basis in her history upon which to attribute such trauma to any particular means or mechanism, Dr. Brockmeyer testified that there was no non-speculative basis upon which to conclude that any particular mechanism or means, whether accidental or non-accidental, was a cause of S.M.K.'s

---

[9] The source of the "unfortunate" "non-accidental trauma" reference in S.M.K.'s medical history, as discussed at deposition by Dr. Brockmeyer, is unclear on the M. R. Civ. P. 56 factual record, and the parties' briefing here and below, whether from Dr. Hedlund's non-record Bozeman radiology/MRI report, another preliminary radiology report referenced in Dr. Brockmeyer's August 2020 deposition testimony, or a non-record note of another involved Children's Hospital physician.

subdural hematomas. At most, he could say only that "something happened between December [2016] and January" 2017.[10]

¶12 Upon awareness of S.M.K.'s diagnosed subdural hematomas and the fact that subdural hematomas are often associated with non-accidental child abuse, the Gallatin County Sheriff's Office (GCSO) and MDPHHS Child and Family Services Division (MDPHHS-CFS) conducted coordinated criminal and child abuse investigations of both Kosteleckys and Peas in a Pod personnel.[11] MDPHHS-CFS ultimately closed its child abuse/neglect complaint investigation as "unsubstantiated." Upon exhausting all apparent avenues of investigation, the GCSO similarly took no further action. The lead GCSO detective later testified that his investigation found insufficient cause for criminal prosecution based on the lack of evidence indicating where or how S.M.K.'s apparent head trauma occurred and who, if anyone, perpetrated or caused it to occur.

¶13 Nonetheless, in November 2018, Kosteleckys filed a district court complaint against Peas in a Pod, LLC, Allen, and Williams for compensatory and punitive damages based on various asserted negligence-based tort, breach of contract, and MCPA claims.[12] Common

---

[10] Dr. Brockmeyer thus clarified that he "want[ed] to avoid [use of] the term 'injury'" regarding S.M.K.'s condition "because we don't know if it's an injury," and that his focus was only on "her disease process . . . and how much blood and protein" was present.

[11] MDPHHS-CFS is charged with the duty and authority to investigate child abuse and neglect under Title 41, chapter 3, MCA.

[12] The asserted negligence-based claims included negligence, negligence per se, negligent entrustment of S.M.K. to an untrained and unsupervised 17-year-old Peas in a Pod "helper," and negligent training and supervision of the "helper" regarding her care of S.M.K. The asserted contract claim essentially alleged that Allen and Williams breached their contractual duties to Kosteleckys to safely care for S.M.K. and to provide a safe environment for her in compliance

11

to all asserted claims, the complaint alleged, *inter alia*, that the defendants caused or allowed S.M.K. to suffer a serious head injury and other injuries on or about December 22, 2016. However, the complaint did not allege any specific act or omission of any of the defendants or third party as the asserted cause of the claimed injuries to S.M.K.

¶14 During the discovery phase of the litigation, the parties deposed numerous witnesses, none of whom attributed any specific cause as the cause of S.M.K.'s subdural hematomas other than, as diagnosed by Dr. Brockmeyer, some form of head trauma of unknown origin or type. After nearly two years of discovery, the defendants filed a motion for summary judgment in October 2020, and a related motion for partial summary judgment in November 2020. In pertinent part, defendants asserted that Kosteleckys had no non-speculative evidence that the subdural hematomas experienced by S.M.K. in December 2016 and January 2017 were the result of any particular act or omission by any of the defendants or other Peas in a Pod personnel. They further asserted that Kosteleckys similarly had no non-speculative evidence upon which to reasonably conclude that the head trauma that caused the diagnosed subdural hematomas even occurred while S.M.K. was at the Peas in a Pod Daycare. Defendants thus asserted that Kosteleckys could not satisfy their burden of proof under the causation element of any of their asserted claims. Kosteleckys opposed the pertinent summary judgment motion on the asserted ground that

with governing MDPHHS day care regulations. The asserted MCPA claim essentially alleged that, in violation of the MCPA, defendants engaged in unfair, unlawful, or deceptive acts or omissions in the provision of day care to S.M.K. in disregard of governing statutory and MDPHHS day care licensure and related requirements.

12

genuine issues of material fact remained as to where and when the causative head trauma occurred and who or what caused that trauma. *Inter alia*, they essentially asserted that Dr. Brockmeyer's undisputed deposition testimony, that S.M.K.'s bilateral subdural hematomas (brain swelling) were likely caused by some form of trauma, and the temporal coincidence between her resulting symptoms and presence at Peas in a Pod were at least minimally sufficient to raise a genuine issue of material fact precluding summary judgment under M. R. Civ. P. 56. In addition to the above-referenced facts, the Rule 56 summary judgment record also included, *inter alia*, the testimony of:

(1) S.M.K.'s primary care physician (Dr. Kjerstad) that she could not state with any degree of certainty who, if anyone, injured S.M.K. or how, where or when the alleged injury occurred (other than "prior to four months of age");

(2) the investigating GCSO detective that he had no idea what happened to S.M.K. because he was unable to determine the cause of her injury, who may have caused it to occur, or even where it occurred, whether at the day care or some other place;[13]

(3) Allen and Williams that neither of them ever shook, hit, or otherwise caused injury to S.M.K., saw or heard anyone else shake, hit, or cause injury to her, or had any knowledge as to how her subject condition may have occurred or who may have caused it;

(4) the 17-year-old Peas in a Pod "helper" (Madi Acuff) that, when on-staff at the day care on December 22 and 23, 2016, she did not ever see S.M.K. fall or get dropped, and that she did not know what caused S.M.K.'s condition or injury;

---

[13] The detective reached those conclusions despite noting Allen's demonstrative post-incident interview statement that "we're human[,] we get frustrated," and "if we do get to that point sometimes," we just have to "put" the infants in "their little bed" and "walk away for a few minutes." The detective noted that, while making that statement, Allen made a generalized arm gesture of pushing something away from her body.

13

(5)      Mother (Julie Kostelecky) that she had "no idea" what happened to S.M.K., whether or not she was accidentally hurt or injured, or "who harmed" her; and

(6)      Father (Jason Kostelecky) that he had no evidence to support the complaint allegation that S.M.K. suffered a serious head injury at Peas in a Pod Daycare on or about December 22, 2016.

¶15      Following the noticed summary judgment hearing on February 11, 2021, the District Court granted Kosteleckys' motion for leave to supplement the Rule 56 factual record to address and clarify factual assertions made at the motions hearing. Kosteleckys' subsequent supplemental filing consisted of an additional excerpt from Dr. Brockmeyer's deposition testimony, an unauthenticated printout from the MDPHHS-CFS child abuse/neglect case information management database system regarding its 2017 child abuse/neglect investigation,[14] and a unauthenticated printout from the University of Utah Pediatrics Department listing the professional curriculum vitae of Dr. Kristine Campbell.[15] On its face, the purported MDPHHS-CFS database printout sets forth various case file information logs, notes, and investigatory summaries and impressions entered into the source database system by MDPHHS-CFS personnel. Included among the various

---

[14] Filed with the unauthenticated MDPHHS-CFS database case file record printout was a similarly unauthenticated copy of a MDPHHS-CFS information request form, apparently signed by Mother on May 1, 2017, bearing the ink-stamped notation "Received May 05 2017," and seeking release of a complete copy of the 2017 MDPHHS-CFS investigation file regarding S.M.K. to Kosteleckys' counsel.

[15] Dr. Kristine Campbell, MD, MSC, is a general pediatrician, child abuse pediatrics consultant, and Assistant Professor in the Pediatrics Department of the University of Utah School of Medicine Child Protection and Family Health Division. While not entirely clear from the record, Dr. Campbell apparently was involved in the initial evaluation of S.M.K. at the Primary Children's Hospital as part of the child protection team referenced in Dr. Brockmeyer's deposition testimony.

investigative summary information referenced in the MDPHHS-CFS case file database printout are notes of telephone conversations with Dr. Campbell on January 29 and 31, 2017, incident to S.M.K.'s Children's Hospital evaluation and treatment. *Inter alia*, the MDPHHS-CFS database summaries assert that Dr. Campbell stated that S.M.K.'s "brain bleeding is consistent with head trauma or 'shaken baby syndrome'" and that her "injuries are consistent with shaking." While Kosteleckys previously noticed Dr. Campbell as a "non-retained" evaluating medical expert witness, the Rule 56 record does not include any first-hand medical note, report, record, or deposition or affidavit testimony issued or given by Dr. Campbell stating or otherwise indicating a more definite opinion as to the cause of S.M.K.'s subdural hematomas.[16]

¶16 On April 7, 2021, the District Court granted summary judgment to the defendants on Kosteleckys' asserted tort, contract, and MCPA claims on the stated grounds that: (1) Kosteleckys made no retained expert medical showing establishing the medical causation of S.M.K.'s diagnosed subdural hematomas; (2) beyond some form of unknown

---

[16] Kosteleckys' briefs in opposition to the defendants' motions for summary judgment below are similarly devoid of any reference to Dr. Campbell, or any factual assertion attributed to her. The only reference to Dr. Campbell in Kosteleckys' briefing on appeal is in the referenced M. R. Civ. P. 26(b)(4) report of their retained child care licensing and standards expert (Pauline D. Koch). As a basis for her anticipated child care licensing and standards compliance testimony, Ms. Koch's report references a purported quote from an unidentified medical note to the effect that "[i]n the absence of other explanations, trauma is by far the most likely cause of subdural hemorrhage in an infant. . . . [S.M.K. has] no trauma history [which] lead[s] to significant *concern* for abusive head trauma." (Emphasis added.) The referenced portion of the Koch report further noted, as a basis for her disclosed child care licensing and standards opinions, that Dr. Campbell "stated that the timing of [S.M.K.'s] injury corresponded to [her] history of increased irritability and vomiting described in mid-December" 2016.

accidental or non-accidental trauma, the record expert opinion testimony, and related medical records in the Rule 56 record, of the medical professionals who examined and treated S.M.K. were insufficient to show the existence of a genuine issue of material fact as to the type, mechanism, source, or perpetrator, if any, of any trauma that likely caused S.M.K.'s subdural hematomas; and (3) Kosteleckys presented no direct or circumstantial evidence sufficient to support a non-speculative conclusion that any particular act or omission of any of the defendants or other Peas in a Pod personnel shook, dropped, or otherwise caused S.M.K. to suffer head trauma, or even that "S.M.K. suffered any . . . trauma (accidental or non-accidental) while in Defendants' care." Kosteleckys timely appeal.

## STANDARD OF REVIEW

¶17 Summary judgment rulings are subject to de novo review for conformance with applicable M. R. Civ. P. 56 standards and requirements. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.*, 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). A genuine issue of material fact exists only if the Rule 56 factual record manifests a non-speculative record fact that is materially inconsistent with proof of an essential element of an asserted claim or defense at issue. *Mt. W. Bank, N.A. v. Mine & Mill Hydraulics, Inc.*, 2003 MT 35, ¶ 28, 314 Mont. 248, 64 P.3d 1048. The party seeking summary judgment has the initial burden of showing a complete absence of any genuine issue of material fact on the Rule 56 record and that the

16

movant is accordingly entitled to judgment as a matter of law. *Weber v. Interbel Tel. Coop.*, 2003 MT 320, ¶ 5, 318 Mont. 295, 80 P.3d 88; *Thelen v. City of Billings*, 238 Mont. 82, 85, 776 P.2d 520, 522 (1989). The burden then shifts to the opposing party to either show the existence of a genuine issue of material fact or that the moving party is nonetheless *not* entitled to judgment as a matter of law. *Osterman v. Sears, Roebuck & Co.*, 2003 MT 327, ¶ 17, 318 Mont. 342, 80 P.3d 435 (citing *Bruner v. Yellowstone Cty.*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995)).

¶18    To meet the responsive Rule 56 burden of demonstrating that genuine issues of material fact preclude summary judgment, the non-moving party must in proper form, and by more than mere denial, speculation, or pleading allegation, "set out specific facts" showing the existence of a genuine issue of material fact. M. R. Civ. P. 56(e)(2). *See also Grimsrud v. Hagel*, 2005 MT 194, ¶ 14, 328 Mont. 142, 119 P.3d 47; *Osterman*, ¶ 34; *Old Elk v. Healthy Mothers, Healthy Babies, Inc.*, 2003 MT 167, ¶¶ 15-16, 316 Mont. 320, 73 P.3d 795; *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997); *Mysse v. Martens*, 279 Mont. 253, 262, 926 P.2d 765, 770 (1996); *Eitel v. Ryan*, 231 Mont. 174, 178, 751 P.2d 682, 684 (1988). The court must view the Rule 56 factual record in the light most favorable to the non-moving party and draw all reasonable inferences in favor thereof. *Weber*, ¶ 5; *Gamble Robinson Co. v. Carousel Properties*, 212 Mont. 305, 311-12, 688 P.2d 283, 286-87 (1984). The court has no duty, however, to anticipate or speculate as to the existence of contrary material facts. *Gamble*, 212 Mont. at 312, 688 P.2d at 287 (internal citations omitted). Whether a genuine issue of material fact exists or whether a

17

party is entitled to judgment as a matter of law are conclusions of law reviewed de novo for correctness. *Ereth v. Cascade Cty.*, 2003 MT 328, ¶ 11, 318 Mont. 355, 81 P.3d 463. *See also Speer v. Mont. Dep't of Corrections*, 2020 MT 45, ¶ 17, 399 Mont. 67, 458 P.3d 1016 (applications and conclusions of law are subject to de novo review for correctness).[17]

## DISCUSSION

¶19    1. *Whether the District Court erroneously granted summary judgment to Defendants on the causation element of Kosteleckys' negligence-based tort claims?*

¶20    The essential elements of a negligence claim are:  (1) the existence of an applicable legal duty owed to the claimant; (2) breach of that duty; (3) causation of harm; and (4) resulting pecuniary damages. *Peterson v. Eichhorn*, 2008 MT 250, ¶ 23, 344 Mont. 540, 189 P.3d 615; *Krieg v. Massey*, 239 Mont. 469, 472, 781 P.2d 277, 278-79 (1989); *Mang v. Eliasson*, 153 Mont. 431, 435, 458 P.2d 777, 779-80 (1969).  The claimant has the burden of presenting sufficient evidence to prove each of the breach, causation, and damages elements of a negligence claim by a preponderance of the evidence. *Faulconbridge v. State*, 2006 MT 198, ¶ 77, 333 Mont. 186, 142 P.3d 777; *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 41, 297 Mont. 336, 993 P.2d 11; *Varn v. Butte Elec.*

---

[17] As a narrow exception to the general standard of de novo review, when a summary judgment ruling is based on exclusion of opponent-proffered expert testimony, we review the exclusionary ruling for an abuse of discretion under the applicable procedural and evidentiary rules, with the balance of the summary judgment ruling subject to de novo review for correctness. *McClue v. Safeco Ins. Co. of Ill.*, 2015 MT 222, ¶¶ 12-14, 380 Mont. 204, 354 P.3d 604 (rejecting asserted de novo standard of review—internal citations omitted).

*Ry. Co.*, 77 Mont. 124, 129, 249 P. 1070, 1071 (1926). *See similarly* §§ 26-1-401, -402, and -403(1), MCA (civil burdens of proof and persuasion).

¶21 The preponderance of the evidence standard merely requires proof sufficient to support a conclusion that the asserted existence, non-existence, occurrence, or non-occurrence of the subject fact or factual occurrence was, is, or will be more probable than not, i.e., more likely than not. *Mont. State Univ.-N. v. Bachmeier*, 2021 MT 26, ¶ 61, 403 Mont. 136, 480 P.3d 233; *Hohenlohe v. Mont. Dep't of Nat. Res. & Conservation*, 2010 MT 203, ¶ 33, 357 Mont. 438, 240 P.3d 628. *Accord Merkel v. Internal Rev. Comm'r*, 192 F.3d 844, 852 (9th Cir. 1999); *Tannehill v. Finch*, 232 Cal. Rptr. 749, 751 (Cal. Ct. App. 1986); *Page v. Clark*, 592 P.2d 792, 800 (Colo. 1979) (quoting McCormick, *The Law of Evidence* § 339 (2d ed. 1972)). While proof of the breach, causation, and damages elements involve questions of fact generally not amenable to summary judgment as a matter of law, "summary judgment in favor of the defendant is [nonetheless] proper" if the claimant fails to satisfy its initial burden of making an affirmative showing of proof, based on admissible evidence, on any one of the breach, causation, and damages elements of a negligence claim. *Eichhorn*, ¶ 24 (internal citations omitted); *Cusenbary v. Mortensen*, 1999 MT 221, ¶ 21, 296 Mont. 25, 987 P.2d 351; *White v. Murdock*, 265 Mont. 386, 389-90, 877 P.2d 474, 476 (1994). *See also* M. R. Civ. P. 56(c)(3) and (e)(1); *Alfson v. Allstate Prop. & Cas. Ins. Co.*, 2013 MT 326, ¶¶ 11 and 14, 372 Mont. 363, 313 P.3d 107; *Northern Cheyenne Tribe v. Roman Cath. Church ex rel. Dioceses of Great Falls & Billings*, 2013 MT 24, ¶¶ 21 and 40, 368 Mont. 330, 296 P.3d 450; *Lorang v. Fortis Ins.*

19

*Co.*, 2008 MT 252, ¶ 80, 345 Mont. 12, 192 P.3d 186; *Hiebert v. Cascade Cty.*, 2002 MT 233, ¶¶ 27-34, 311 Mont. 471, 56 P.3d 848; *Weber*, ¶ 5; *Thelen*, 238 Mont. at 85, 776 P.2d at 522.

¶22     As pertinent here, the causation element of a negligence claim requires affirmative proof that the alleged negligent conduct (i.e., alleged breach of a legal duty) was a cause-in-fact (i.e., factual cause) of the alleged harm and resulting damages. *Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 371, 916 P.2d 122, 139 (1996); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155, 166-67, 789 P.2d 567, 574 (1990) (citing *Young v. Flathead Cty.*, 232 Mont. 274, 757 P.2d 772 (1988)), *partially overruled on other grounds by Busta*, 276 Mont. at 370, 916 P.2d at 139.[18]     Except under alternative cause-in-fact standards not pertinent here,[19] alleged negligent conduct was a cause-in-fact if the alleged harm and resulting damages "would not have occurred but for that conduct." *Busta*, 276 Mont. at 371, 916 P.2d at 139 (internal citation and punctuation omitted). *Accord Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 36, 342 Mont. 335, 181 P.3d 601 (quoting *Busta*). In other words, the alleged negligent conduct was a cause-in-fact if it is more probable or likely than not that the alleged harm and resulting damages would not have occurred without or but for the alleged negligent conduct. *See Busta*, 276 Mont. at

---

[18] *See also* § 27-1-317, MCA (tort causation standard as clarified in *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40).

[19] *Busta*, 276 Mont. at  371, 916 P.2d at 139 (in re alternative "substantial factor" and "natural and continuous sequence" causation-in-fact tests).

370, 916 P.2d at 139; §§ 26-1-401 through -403(1), MCA; *Bachmeier*, ¶ 61; *Hohenlohe*, ¶ 33.

¶23     Except in rare cases where the cause of the alleged injury is plain and obvious to lay persons without need for specialized knowledge or expertise, *McCormack v. Andres*, 2008 MT 182, ¶ 45, 343 Mont. 424, 185 P.3d 973, proof of the occurrence, nature, cause, and/or prognosis of an alleged bodily or mental injury, disease process, or other medical condition generally requires qualified medical expert testimony. *See, e.g.*, *Hinkle v. Shepard Sch. Dist.*, 2004 MT 175, ¶¶ 35-38, 322 Mont. 80, 93 P.3d 1239 (qualified expert testimony required for proof of factual issues beyond the common knowledge and experience of lay persons including causation of alleged bodily and mental injury); *Henricksen v. State*, 2004 MT 20, ¶ 70, 319 Mont. 307, 84 P.3d 38 (expert testimony required to establish causal connection between subject injury and preexisting injury or independent cause); *Christofferson v. City of Great Falls*, 2003 MT 189, ¶¶ 35-49, 316 Mont. 469, 74 P.3d 1021 (expert medical testimony required to assess viability of treatment options and prognosis); *Busta*, 276 Mont. at 354-57, 916 P.2d at 129-31 (lay opinion not competent evidence of medical diagnosis and causation); *Cain v. Stevenson*, 218 Mont. 101, 105-06, 706 P.2d 128, 131 (1985) (expert medical testimony generally required for injury causation diagnosis and prognosis except where obvious without need for specialized expertise). *Accord McClue v. Safeco Ins. Co. of Ill.*, 2015 MT 222, ¶ 29, 380 Mont. 204, 354 P.3d 604 (citing *Hinkle*). *See also* M. R. Evid. 701 and 702 (limiting non-expert testimony and authorizing qualified expert testimony). In that regard, otherwise qualified expert medical

21

testimony regarding the occurrence, nature, cause, and/or prognosis of an alleged bodily or mental injury, disease process, or other medical condition is competent and admissible evidence only if given on a more probable than not basis, i.e., a more likely than not basis, or other similar or greater level of certainty of opinion. *McClue*, ¶ 29; *Hinkle*, ¶ 36; *State v. Vernes*, 2006 MT 32, ¶¶ 15-19, 331 Mont. 129, 130 P.3d 169; *Dallas v. Burlington N. Inc.*, 212 Mont. 514, 522-23, 689 P.2d 273, 277 (1984) (equating more probable than not, or more likely than not, standard of admissibility of expert medical opinion as qualitatively similar and synonymous with qualified medical opinions stated to a reasonable degree of medical certainty); *Allers v. Willis*, 197 Mont. 499, 505, 643 P.2d 592, 595-96 (1982) ("[p]laintiff must prove by legally sufficient evidence that all the injuries for which he claims damages are properly attributable, in a medical sense, to the accident" and "must do so with reasonable certainty or by a preponderance of the evidence").[20] Consequently, expert medical opinion that a specified occurrence, conduct, or mechanism of injury, disease, or other medical condition could, may, or might have possibly caused or contributed to, or is the suspected or assumed cause or contributing cause of, the injury, disease, or medical condition at issue is neither competent nor relevant proof of causation of that matter. *Vernes*, ¶¶ 15-19 (affirming exclusion of expert medical testimony in support of involuntary intoxication defense that "a definite possibility existed" that

---

[20] *Accord Ford v. Sentry Cas. Co.*, 2012 MT 156, ¶¶ 41-43, 365 Mont. 405, 282 P.3d 687 (equating more probable than not, or more likely than not, standard of admissibility of expert medical opinion with reasonable medical certainty standard—citing *Dallas*).

defendant's use of prescription Xanax caused her to suffer a particular side effect reaction to the drug); *Hinkle*, ¶¶ 21 and 35-38 (affirming grant of summary judgment to tort claim defendant where claimant failed to present expert medical testimony establishing causal relationship between alleged tortious conduct and claimed resulting diabetes onset/aggravation and post-traumatic stress disorder); *Butler v. Domin*, 2000 MT 312, ¶¶ 13-15, 302 Mont. 452, 15 P.3d 1189 (affirming district court exclusion of expert medical causation testimony that an epidural injection performed by a defendant physician "could have caused" the claimant's alleged injury); *Nelson v. Mont. Power Co.*, 256 Mont. 409, 412, 847 P.2d 284, 286 (1993) ("a suspicion" regarding what "*possibly*" caused an injury, "regardless of how particularized it may be, is not sufficient to sustain an action or to defeat a motion for summary judgment").

¶24　　Here, common to all of Kosteleckys' negligence-based claims is the essential requirement for proof that the defendants' alleged negligent conduct was more probably or likely than not a cause-in-fact (factual cause) of the diagnosed subdural hematomas that S.M.K. experienced in December 2016 and January 2017. In furtherance of their initial affirmative burden of proof under M. R. Civ. P. 56, Kosteleckys have shown, based on Dr. Brockmeyer's uncontradicted medical records and corresponding opinion testimony, that the most likely cause of S.M.K.'s subdural hematomas was some form or type of physical trauma, of unknown source or occurrence, that could possibly have occurred in any number of ways including merely rolling over in her crib, other normal infant activity without other human involvement, some of form of human handling or mishandling of her,

23

or some other source or mechanism of human-involved trauma. However, based on all of the available medical evidence, and the lack of any non-speculative basis upon which to attribute such trauma to any particular means or mechanism, Dr. Brockmeyer testified that there was no non-speculative basis upon which to conclude that any particular mechanism or means, whether accidental or non-accidental, was a cause of S.M.K.'s subdural hematomas. At most, he could say only that "something happened between December [2016] and January" 2017.

¶25 For purposes of M. R. Evid. 702 (expert opinion admissibility standards), the identification of what type, means, or mechanism—whether trauma in general or some more particular source of trauma—could possibly have caused and, on a more probable or likely than not basis, did in fact cause S.M.K.'s diagnosed subdural hematomas is predominantly, if not exclusively, a matter requiring specialized medical expertise beyond the common knowledge and experience of lay persons. Both parties concur, and the record reflects, that Dr. Brockmeyer is eminently qualified to render an expert medical opinion regarding those matters in this case, and that his ultimate opinion testimony, that there is no non-speculative basis upon which to identify any particular type, means, or mechanism of force as the source of the force or trauma that caused S.M.K.'s subdural hematomas, is highly credible and uncontradicted on the Rule 56 factual record in this case.

¶26 However, by analogy to our pertinent analysis and holding in *Beehler v. E. Radiological Assocs., P.C.*, 2012 MT 260, ¶¶ 34-40, 367 Mont. 21, 289 P.3d 131, Kosteleckys assert that Dr. Brockmeyer's uncontradicted attribution of some form of force

or trauma as the likely cause of the subdural hematomas experienced by S.M.K. is sufficient to establish a genuine issue of material fact as to whether the defendants' alleged negligent conduct was the cause of those medical conditions when coupled with the noticed opinion testimony of their retained child care licensing and standards expert (Pauline D. Koch) and record evidence which they assert undermines the credibility of the defendants' testimonial denials "that anything happened to S.M.K. at [the Peas in a Pod] day-care."

¶27     *Beehler* involved a medical-malpractice-based wrongful death claim alleging, *inter alia*, that the defendant radiologist negligently performed a diagnostic spinal fluid injection procedure on the subject patient without wearing a protective surgical mask, thereby exposing the patient's spinal fluid to contamination from a particular strain of infectious, meningitis-causing bacteria (GBS) present in moisture droplets emanating from the radiologist's breath. *Beehler*, ¶¶ 1-4.  It was undisputed on the Rule 56 record that the radiologist "was the only person within the zone of oral droplet transmission surrounding [the patient] during the critical portions" of the procedure, that infectious GBS bacteria was transmitted into the patient's cerebral-spinal fluid "when the [injection] needle entered her spinal column," and that there were two possible sources of the GBS bacteria—the patient's own skin and the radiologist's mouth. *Beehler*, ¶¶ 3, 38, and 40.  In opposition to defendant's motion for summary judgment on the causation element of the claim, the claimants proffered the opinion testimony of their retained medical expert who testified that GBS present in and transmitted via moisture droplets emanating from the radiologist's breath was the "most likely" cause of the GBS contamination of the patient's spinal fluid,

25

and thus the radiologist's failure to wear a protective surgical mask was the "most likely" cause of the patient's resulting spinal-meningitis-caused death. *Beehler*, ¶¶ 6 and 34.

¶28 The district court granted summary judgment to the defendant, however, on the stated ground that the causation opinion of the claimants' medical expert was based on conjecture, speculative, and did not satisfy the more likely than not standard for admissibility of expert testimony under M. R. Evid. 702 and *Dallas*, *supra*. *Beehler*, ¶¶ 9, 10, and 34. *Inter alia*, the district court "specifically faulted the lack of [medical] literature" on GBS-caused meningitis incident to the subject spinal injection procedure, "the lack of cases involving oral transmission of GBS," and the record fact that there was a 90-95 percent chance that the GBS bacteria was not present in the radiologist's airway at the time of the procedure. *Beehler*, ¶ 34.

> [T]he court [also] seemed to take issue with [the expert's] use of what it regarded as suspect terminology. In particular, the court cited [his] statements that GBS meningitis following [the subject procedure] is "rare times rare," that science can only "speculate" as to how, exactly, a bacterium travels from the oral pharynx into the CSF, and his use of "suspicion" while discussing how the GBS bacteria entered [the patient's cerebral-spinal fluid].

*Beehler*, ¶ 36.

¶29 On appeal, we reversed, however, holding that the district court erroneously excluded the claimants' proffered expert medical causation testimony as a summary judgment consideration because the expert's "most likely" causation opinion was, in context of the balance of his testimony, "a statement of probability" that the radiologist's uncovered mouth was the source of the GBS contamination and that her failure to wear a protective mask was thus the cause of the patient's meningitis and resulting death. *Beehler*,

¶¶ 38-40. We noted that the Rule 702 standard of admissibility does not require experts to opine with any greater "level of exactitude" than on a more probable or likely than not basis. *Beehler*, ¶ 39. *See similarly Dallas*, 212 Mont. at 521-23, 689 P.2d at 276-77 (treating physician inability to determine which of three possible medical conditions caused the symptoms and resulting permanent impairment suffered by the claimant did not preclude admission of his accident-related permanent impairment opinion where all three possible etiologies produced similar symptoms and both treating physicians agreed that the claimant "was injured as a result of trauma suffered in the [subject] accident").

¶30    Contrary to Kosteleckys' assertion, the only circumstances here analogous to those in *Beehler* are that, as in *Beehler*, Dr. Brockmeyer testified that there are a number of potential sources of force or trauma that could possibly have caused S.M.K.'s diagnosed subdural hematomas. But, unlike here, the claimants' medical expert in *Beehler* went on to conclude that only one of the multiple potential causes of the subject bacterial infection—the likely presence of the source bacteria in the radiologist's mouth and her associated failure to wear a protective mask—was the "most likely" cause of the subject injury. *Beehler*, ¶¶ 38-40. Here, Dr. Brockmeyer could not testify on a more probable or likely than not basis that any one of the potential sources that could possibly have caused the trauma that likely caused S.M.K.'s subdural hematomas was the most likely cause. *Beehler* is further distinguishable because, unlike here, the non-medical conduct or circumstance which the medical expert identified as the most likely cause of the medical condition and resulting death at issue—the defendant's failure to wear a protective surgical

27

mask—was undisputed. Here, in contrast, Kosteleckys have made no showing of any direct or circumstantial evidence upon which the finder of fact could reasonably conclude or infer on a non-speculative, more probable than not basis that a particular act or omission by Allen or Williams was the, or even a, source and cause-in-fact of the physical trauma generally diagnosed by Dr. Brockmeyer as the most likely cause of S.M.K.'s subdural hematomas.

¶31 Tacitly acknowledging that glaring evidentiary omission, Kosteleckys assert that the District Court erroneously failed to consider the M. R. Civ. P. 26(b)(4) disclosure of their retained child care licensing and standards expert, Ms. Koch, regarding "her opinions about whether [the defendants] breached [their pertinent legal] duties related to the injuries suffered by S.M.K." Kosteleckys particularly rely on cited characterizations in Ms. Koch's Rule 26(b)(4) disclosure/"report" that: (1) the "most likely" cause of S.M.K.'s subdural hematomas was "abusive head trauma"; (2) Allen and Williams were "seemingly unaware of 'danger signs of shaken baby syndrome/abusive head trauma'"; and (3) the materials Ms. Koch reviewed "relate[] to the 'serious' head injury . . . suffered" by S.M.K. "at Peas in a Pod Group Day Care Home." As a threshold matter, however, Ms. Koch is not a qualified medical expert who has rendered disclosed opinion testimony regarding the causation of S.M.K.'s diagnosed medical condition. Nor is she a fact or expert witness with personal knowledge of any act or omission of any Peas in a Pod personnel in the actual physical handling, treatment, or care of S.M.K., much less knowledge of any particular cause-in-fact of any physical force or trauma experienced or inflicted upon S.M.K. To the

28

extent that Kosteleckys rely on cited substantive information restated or derived from the materials that Ms. Koch's report states that she reviewed in forming her opinions, otherwise inadmissible hearsay statements and materials which are admissible under M. R. Evid. 703 to explain the bases of an expert's opinion are not relevant and admissible as substantive proof of the matters asserted therein. *In re C.K.*, 2017 MT 69, ¶¶ 21 and 29, 387 Mont. 127, 391 P.3d 735 (harmonizing M. R. Evid. 703 and 801). Rule 703 does not allow the use of experts "as a conduit" for admission of "otherwise inadmissible information as substantive evidence." *C.K.*, ¶ 21. Moreover, documents or records setting forth testimonial assertions are not competent evidence of the matters asserted therein under M. R. Civ. P. 56(e) unless properly authenticated under M. R. Evid. 901-02, based on personal knowledge of the declarant as required by M. R. Evid. 602, and not inadmissible hearsay under M. R. Evid. 801-05 and 703. *C.K.*, ¶¶ 21 and 29; *Alfson*, ¶¶ 11 and 14; *Northern Cheyenne Tribe*, ¶¶ 21 and 40; *Lorang*, ¶ 80; *Hiebert*, ¶¶ 27-34. Thus, Kosteleckys have made no showing that any of Ms. Koch's cited characterizations of the cause of S.M.K.'s subdural hematomas, or related references to the materials that she considered in forming her day care licensing and standard of care compliance opinions, have any competent and non-speculative basis in the Rule 56(c)(3) and (e) factual record.

¶32 Further, fairly construed in the light most favorable to Kosteleckys, the expert opinions disclosed in Ms. Koch's Rule 26(b)(4) "report" exclusively pertain to whether the defendants may have been negligent per se and/or violated the applicable standard of care for infant day care based on alleged violations of pertinent statutory and regulatory day

29

care requirements. However, proof that a defendant was negligent or negligent per se is not necessarily sufficient to prove that the negligence was a cause-in-fact of the alleged injury or harm, i.e., that the alleged injury or harm "would not have occurred but for that conduct." *See Folsom v. Mont. Pub. Employees Ass'n, Inc.*, 2017 MT 204, ¶¶ 32-33, 388 Mont. 307, 400 P.3d 706; *Busta*, 276 Mont. at 371, 916 P.2d at 139 (internal citation and punctuation omitted). As we recognized long ago:

> [W]hen the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence [or] many other causes. Such evidence has no tendency to show that negligence did cause the injury.

*Schumacher v. Murray Hosp.*, 58 Mont. 447, 462-63, 193 P. 397, 402 (1920) (quoting *Ewing v. Goode*, 78 F. 442, 444 (C.C.S.D. Ohio 1897)).

¶33     Moreover, aside from merely constituting a purported quote from a "medical report" not included in the Rule 56 record and of unclear source, whether from the examining Bozeman MRI radiologist or an examining or consulting Salt Lake Children's Hospital physician other than Dr. Brockmeyer, the purported medical record quote falls far short of supporting Ms. Koch's broader causation characterizations, to wit:

> The medical report stated [that], "[i]n the absence of other explanations, *trauma* is by far the *most likely cause* of subdural hemorrhage in an infant. There is no trauma history [regarding S.M.K.] . . . *leading to* significant *concern for* abusive head trauma . . . at least 6 weeks [prior].

Kosteleckys' Opening Brief (quoting Koch Rule 26(b)(4) disclosure/"report"—original emphasis omitted with italics added). Mere attribution of some unknown form or source of force or trauma as the likely cause of S.M.K.'s subdural hematomas, and a related

*concern* because such conditions are often associated with abusive head trauma, are patently insufficient without more to support or give rise to a non-speculative deduction that abusive head trauma was the likely cause of those conditions.

¶34    Similarly lacking is Kosteleckys' attempt to draw a causal connection between S.M.K.'s diagnosed subdural hematomas and Ms. Koch's day care licensing, standard of care, and compliance opinions regarding the defendants' alleged negligence, to wit:

> Based upon [her] review [of the referenced materials], Koch criticizes Allen and Williams:
>
>> Their health and safety training did not prepare them to recognize the symptoms expressed by SMK in late December 2016 and January 2017 *which resulted in a diagnosis* of a subdural hemorrhage *most likely caused by abusive head trauma*.
>>
>> .   .   .
>
> Based upon her analysis, Koch opines:
>
>> It is clear that [Allen and] Williams created an environment in which [S.M.K.] was able to sustain an unexplained, life threatening brain injury while in their care at Peas in a Pod Group Day Care Home.  Based on the facts and history of this group day care home, it is more likely than not that Allen and Williams were unaware of what was going on in their childcare facility.  In my opinion, the failure of Allen and Williams to maintain and retain sufficient records for PIAP operations makes review of their actions more difficult than it should be and further *establishes they violated the standard of care*.

Kosteleckys' Opening Brief (quoting Koch Rule 26(b)(4) disclosure/"report"—original emphasis omitted with italics added).  The manifest problem, however, is that the cited snippets from Ms. Koch's Rule 26(b)(4) "report," and Kosteleckys' related assertions on appeal, are clearly based on a misstatement of the more limited record medical evidence.

31

Dr. Brockmeyer's uncontradicted expert opinion testimony is the sole medical causation opinion evidence in the Rule 56 factual record and goes no farther than concluding that the most likely cause of S.M.K.'s diagnosed subdural hematomas was some form, manner, or type of force or trauma of unknown source, cause, or mechanism. He could say only that "something happened between December [2016] and January" 2017.

¶35 Kosteleckys acknowledge that Allen and Williams categorically denied having any knowledge as to any form of force or trauma experienced by or inflicted upon S.M.K. while in their care, that their deposition testimony is presumed to be truthful,[21] and that there is no contradictory direct evidence indicating that any Peas in a Pod personnel accidentally, intentionally, or otherwise subjected S.M.K., or permitted her to be subjected, to any manner or form of force or head trauma.[22] They assert that a genuine issue of material fact nonetheless remains regarding the cause of S.M.K.'s subdural hematomas because "there are reasonable bases" in the evidentiary record, "including the testimony of Allen and Williams about the operation of [the Peas in a Pod Daycare] and care of S.M.K.," that undermine the credibility of their testimonial denials "that anything happened to S.M.K. at [the Peas in a Pod] day-care." They reason that those asserted credibility issues, combined with Dr. Brockmeyer's uncontradicted testimony and the fact that her symptoms first appeared while in the defendants' care, are sufficient factual bases upon which to

---

[21] *See* § 26-1-302, MCA.

[22] *See* § 26-1-102(5), MCA (defining direct evidence as "that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact").

32

reasonably infer that the diagnosed trauma that most likely caused S.M.K.'s subdural hematomas would not have occurred but for the defendants' negligent day care operation and care of S.M.K.

¶36  We agree, as a general proposition, that an inference based on circumstantial evidence is sufficient for the proof of any disputed fact including, as at issue here, the breach and causation elements of a negligence-based claim. *Britton v. Farmers Ins. Group*, 221 Mont. 67, 88, 721 P.2d 303, 317 (1986); *Fauerso v. Maronick Const. Co.*, 203 Mont. 106, 112, 661 P.2d 20, 23 (1983); *Jacques v. Mont. Nat'l Guard*, 199 Mont. 493, 497, 649 P.2d 1319, 1321 (1982); *Hickman v. First Nat'l Bank of Great Falls*, 112 Mont. 398, 414-16, 117 P.2d 275, 279 (1941); *Dalbey v. Equitable Life Assur. Society*, 105 Mont. 587, 599, 74 P.2d 432, 435 (1937); *Collins v. Crimp*, 91 Mont. 326, 332-33, 8 P.2d 796, 798 (1932); *Johnson v. Herring*, 89 Mont. 420, 425-26, 300 P. 535, 536 (1931); *Childers v. Deschamps*, 87 Mont. 505, 516, 290 P. 261, 264 (1930). We recognize further that: (1) the finder of fact is the exclusive judge of the credibility of Allen and Williams' testimonial denials of any knowledge of any form of force or trauma experienced by or inflicted upon S.M.K. while in their care; (2) the presumption of the truthfulness of Allen and Williams' testimonial denials "may be controverted and overcome by any matter that has a tendency to disprove the truthfulness of [that] testimony," including, *inter alia*, their "interest . . . [in] the litigation" as a "motive to testify falsely" or any "inconsistent statements"; and

(3) the finder of fact is free to "distrust" any testimonial witness upon finding that any other part of his or her testimony is false. Sections 26-1-202, -302(4), (7), and -303(3), MCA.[23]

¶37 However, as pertinent here, circumstantial evidence is that "which tends to establish a fact by proving another and which, though true, does not itself conclusively establish that fact but affords an inference . . . of its existence." Section 26-1-102(1), MCA. In turn, an inference is a permissible "deduction" made "from the [record] evidence." Section 26-1-501, MCA. While M. R. Civ. P. 56(c)(3) requires courts to draw all reasonable inferences on the Rule 56 factual record in favor of the non-moving party, a reasonable inference requires more than mere suspicion, imagination, or apprehension of "something wrong or hurtful without proof or on slight evidence." *State v. Barick*, 143 Mont. 273, 283, 389 P.2d 170, 175 (1964). An inference has probative value as evidentiary proof of a disputed fact only if it is based on duly "proved" record facts and circumstances, *see* §§ 26-1-101(4), -102(1), and -502(1), MCA, and can be reasonably deduced as a logical consequence thereof. *See* §§ 26-1-102(1), -501, and -502, MCA; *Fauerso*, 203 Mont. at 112, 661 P.2d at 23; *Jacques*, 199 Mont. at 497, 649 P.2d at 1321; *Johnson*, 89 Mont. at 425-26, 300 P. at 536; *Inference*, *Black's Law Dictionary* (11th ed. 2019). In contrast, an inference or

---

[23] *See also* M. R. Evid. 607 ("credibility of a witness" is subject to "attack[] by any party"); *State v. McGhee*, 2021 MT 193, ¶ 19, 405 Mont. 121, 492 P.3d 518 (noting Rule 607 "[i]mpeachment by contradiction" as a means of "attacking the credibility of a witness by cross-examination or extrinsic evidence offered to prove that a fact which the witness asserted or relied upon in his or her testimony is not true" for the purpose of establishing "a basis for an inference that the witness either lied or was mistaken with respect to the specific fact contradicted" or "is thus a generally unreliable source of information and therefore similarly mistaken, dishonest, or unreliable as to the balance of his or her testimony"—internal citation and punctuation omitted).

suggested inference has no probative value as circumstantial proof of a disputed fact if any link in the deductive reasoning is based on mere suspicion, conjecture, or speculation. *Britton*, 221 Mont. at 88, 721 P.2d at 317; *Fauerso*, 203 Mont. at 112, 661 P.2d at 23; *Collins*, 91 Mont. at 322-23, 8 P.2d at 798; *Johnson*, 89 Mont. at 425-26, 300 P. at 536. Suspicion, conjecture, or speculation is thus "not a sufficient basis on which to raise a genuine issue of material fact" under M. R. Civ. P. 56(c)(3). *Fauerso*, 203 Mont. at 112, 661 P.2d at 23.

¶38 Here, other than cursory reference to "the testimony of Allen and Williams" regarding their operation of the Peas in a Pod Daycare and care of S.M.K., the only apparent "reasonable" basis pointed out by Kosteleckys which could conceivably constitute a basis for an inference that the cited testimonial denials of Allen or Williams may lack credibility is the cited inconsistency between Allen's deposition denial of any discussion of the Peas in a Pod licensing status or renewal in a telephone conversation with a MDPHHS licensing official on December 22, 2016, and the official's contrary telephone log summary of that conversation.[24] Viewed in the light most favorable to Kosteleckys, any conflicting or contradictory evidence undermining the credibility of the testimonial denials of Allen or Williams regarding their lack of knowledge regarding the cause or source of any head

---

[24] Kosteleckys further point out that Allen's cell phone records indicate a call to Williams at 1:52 p.m. on December 22, 2016, thus asserting that "there would be no reason for Allen to call Williams" if they were both at the day care "caring for children" that day, as asserted by Allen. In context, however, Kosteleckys narrowly raise those points in support of their assertion that the Peas in a Pod Daycare was negligently understaffed that day and that staff negligently failed to "f[i]nd time to call Kosteleckys about their baby screaming for hours." Kosteleckys' Opening Brief, pp. 18-20.

trauma experienced by S.M.K. would still not provide a non-speculative basis upon which the finder of fact could reasonably conclude, on a more probable or likely than not basis, that any particular act or omission of either was the cause-in-fact of head trauma to S.M.K. In other words, mere disproof of the defendants' testimonial denials that they did or know of nothing that could have caused head trauma to S.M.K. is not a non-speculative evidentiary basis upon which to reasonably deduce that they acted or failed to act in any particular manner that did.

¶39    Consequently, a glaring evidentiary gap remains in the causative chain between Dr. Brockmeyer's opinion that the cause of S.M.K.'s subdural hematomas was some unidentified type of force or trauma, and the alleged negligent non-compliance of Allen and Williams with various licensing requirements and the related standard of care regarding S.M.K.   The conspicuous missing link in the causative chain remains the manifest lack of a *non-speculative* evidentiary basis upon which the finder of fact could reasonably conclude, on a more probable than not basis, that S.M.K. would *not* have suffered or been subjected to the head trauma that most likely caused her subdural hematomas *but for* some particular negligent act or omission by Allen, Williams, or other Peas in a Pod personnel.  We hold that the District Court did not erroneously grant summary judgment to the defendants on the causation element of Kosteleckys' asserted negligence-based claims.

¶40    2. *Whether the District Court erroneously granted partial summary judgment to Defendants on Kosteleckys' asserted breach of contract claim?*

36

¶41 Kosteleckys assert that the District Court also erroneously granted summary judgment on their asserted breach of contract claim by erroneously applying a "negligence standard of causation" to that claim. The essential elements of a breach of contract claim are: (1) a valid and enforceable contract; (2) breach of an express or implied contract duty or obligation; and (3) resulting contract damages.[25] *Tin Cup Cty. Water & Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 2008 MT 434, ¶¶ 37-55, 347 Mont. 468, 200 P.3d 60 (breach of contract claim includes burden of proving that the asserted "breach of contract proximately caused the damages"—contract damages "are subject to limitations of causation, certainty, and foreseeability"); *Story v. City of Bozeman*, 242 Mont. 436,

---

[25] The general measure of damages for breach of a contract obligation is the "amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby," or which "in the ordinary course of things would be likely to result therefrom." Section 27-1-311, MCA; *Myers v. Bender*, 46 Mont. 497, 508, 129 P. 330, 333 (1913) (quoting § 6048, RCM (1907) (now § 27-1-311, MCA), and noting that "the statute embodies the common-law rule"). The broad language of § 27-1-311, MCA, thus encompasses two classes of compensable contract damages, expectancy/natural result damages and consequential damages. *State Farm Mut. Auto. Ins. Co. v. Freyer*, 2013 MT 301, ¶ 31 n.2, 372 Mont. 191, 312 P.3d 403 (noting that § 27-1-311, MCA, "permits the recovery of both proximate and consequential damages for breach of contract"); *Mont. Petroleum Tank Release Comp. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶¶ 66 and 70-71, 341 Mont. 33, 174 P.3d 948 (defining consequential damages as damages "contemplated by both parties at the time" of contracting as those that "might naturally be expected to result from" the subject breach); *Arrowhead Sch. Dist. No. 75 v. Klyap.* 2003 MT 294, ¶ 20, 318 Mont. 103, 79 P.3d 250 (defining expectancy damages as the amount necessary to compensate for what the non-breaching party "would [have] receive[d] if the contract were performed"—noting that expectancy damages limitation preserves efficient breach theory of contracts); *Castillo v. Franks*, 213 Mont. 232, 242, 690 P.2d 425, 430 (1984) (measure of compensable contract damages under § 27-1-311, MCA, and resulting "benefit of the bargain rule," includes "the loss of value" to the non-breaching party resulting from the subject breach "plus any other incidental or consequential loss caused by the breach, less any cost or other loss that the injured party has avoided by not having to perform"—purpose of contract damages "is to place the party wronged in as good a position as if the contract had been performed"); *Ehly v. Cady*, 212 Mont. 82, 97, 687 P.2d 687, 695 (1984) (distinguishing between natural and contemplated damages and that all contract damages "are subject to limitations of causation, certainty[,] foreseeability[,]" and reasonableness).

450-51, 791 P.2d 767, 775-76 (1990) (contract breach of implied covenant of good faith and fair dealing); *Garden City Floral Co. v. Hunt*, 126 Mont. 537, 543, 255 P.2d 352, 356 (1953) (distinguishing breach of contract claims from tort claims alleging negligent performance of contract duty); *A.H. Averill Mach. Co. v. Bain*, 50 Mont. 512, 514-15, 148 P. 334, 335 (1915).

¶42    Against the essential elemental backdrop of breach of contract claims, Kosteleckys have not demonstrated on what basis or in what manner, as they assert, the District Court erroneously applied a "negligence standard of causation" to their contract claim. They instead focus on various other asserted arguments in support of the more general assertion that genuine issues of material fact preclude summary judgment on that claim. However, we generally do not address issues raised for the first time or allow parties to assert new unpled theories of liability that are different than pled under the governing complaint. *Mt. W. Bank, N.A. v. Glacier Kitchens, Inc.*, 2012 MT 132, ¶ 13, 365 Mont. 276, 281 P.3d 600.

¶43    In pertinent part, as pled, the gravamen of Kosteleckys' breach of contract claim is their complaint assertion that the defendants breached the alleged terms of the subject day care contract by failing to "provide safe and legally-compliant childcare to S.M.K." in December 2016, thereby causing her to "suffer[] the subject serious head injury," thus entitling Kosteleckys to "all compensation allowed by law *for this harm*." (Emphasis added). On appeal, however, Kosteleckys now assert that the pertinent essence of their contract claim is that the defendants breached the parties' monthly day care contract by failing to refund the monthly service fee which Kosteleckys allegedly prepaid for February

38

2017, but for which they did not receive any corresponding day care service. The manifest recharacterization of Kosteleckys' breach of contract claim on appeal as a claim for compensation for unprovided services in February 2017 is an entirely new and unpled theory of contract liability not encompassed within their originally pled claim. As recharacterized on appeal, Kosteleckys' contract claim includes theories of contract breach and causation that are different than those pled in their complaint and at issue under M. R. Civ. P. 56 below. We hold that the District Court did not erroneously grant summary judgment to the defendants on Kosteleckys' asserted breach of contract claim.

¶44    3.  *Whether the District Court erroneously granted partial summary judgment to Defendants on Kosteleckys' asserted MCPA claim?*

¶45    As with their breach of contract claim, Kosteleckys similarly assert that the District Court erroneously granted summary judgment on their asserted MCPA claim by erroneously applying a "negligence standard of causation" to that claim. Under the MCPA, except under certain circumstances not at issue here, a "consumer who suffers any ascertainable loss of money or property" "as a result of" another person's "use or employment" of an "unfair or deceptive act[] or practice[] in the conduct of any trade or commerce" may "recover money damages in the amount of any ascertainable loss of money or property or $500, whichever is greater." Sections 30-14-102(1), (8)(a), -103, and -133(1)(a), MCA; *Anderson v. ReconTrust Co., N.A.*, 2017 MT 313, ¶ 19, 390 Mont. 12, 407 P.3d 692.[26]  As referenced in § 30-14-133(1), MCA, "ascertainable loss" includes

---

[26] An unfair act or practice "is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to customers." *Rohrer v.*

any proven form of direct or indirect financial detriment or detrimental financial impact. *See Puryer v. HSBC Bank USA, N.A.*, 2018 MT 124, ¶ 36, 391 Mont. 361, 419 P.3d 105; *Jacobson v. Bayview Loan Servicing, LLC*, 2016 MT 101, ¶¶ 53-59, 383 Mont. 257, 371 P.3d 397.  Thus, a private MCPA claim for damages requires proof:  (1) that the defendant "use[d] or employ[ed]" an "unfair or deceptive act[] or practice[] in the conduct of any trade or commerce"; (2) in regard to which the claimant was a "consumer" as defined by § 30-14-102(1), MCA; and (3) which caused the claimant to suffer direct or indirect financial detriment or detrimental financial impact.  *See* §§ 30-14-102(1), (8)(a), -103, and -133(1)(a), MCA; *Puryer*, ¶ 36; *Jacobson*, ¶¶ 53-59.  A plaintiff asserting a private MCPA claim has the burden of proving all essential elements of the claim.  *See* §§ 26-1-401 through -403(1), MCA; *Anderson*, ¶¶ 19-22 (citing § 30-14-133(1), MCA); *Rohrer v. Knudson*, 2009 MT 35, ¶ 32, 349 Mont. 197, 203 P.3d 759 (citing § 30-14-133(1), MCA).[27]

---

*Knudson*, 2009 MT 35, ¶¶ 29 and 31, 349 Mont. 197, 203 P.3d 759 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S. Ct. 898 (1972)).

[27] Upon proof of the essential elements of a MCPA claim, the court, in its discretion, may then "award up to three times the money damages in the amount of any ascertainable loss of money or property sustained, if actual damages do not exceed $100,000, and may provide any other equitable relief that it considers necessary or proper."  Section 30-14-133(1)(a), MCA.  Unless the claimant "recovers actual damages of $100,000 or more," the court may, in its discretion, further award the "prevailing party reasonable attorney fees," at a rate not to exceed $250 per hour, "incurred in prosecuting . . . the action."  Section 30-14-133(3), MCA.  Conversely, in its discretion, the court may similarly award the "prevailing party reasonable attorney fees incurred" by the defendant(s) in successfully "defending the action."  Section 30-14-133(3), MCA.

¶46 Against the essential elemental backdrop of private MCPA claims, Kosteleckys have not demonstrated, as they assert, on what basis or in what manner the District Court erroneously applied a "negligence standard of causation" to their MCPA claim. They instead focus on various other asserted arguments in support of the more general assertion that genuine issues of material fact preclude summary judgment on that claim. However, as noted *supra*, we generally do not address issues raised for the first time on appeal or allow parties to assert new unpled theories of liability that are different than pled under the governing complaint. *Mt. W. Bank, N.A.*, ¶ 13. As pled, the essence of the factual theory of liability asserted under Kosteleckys' MCPA claim is that the defendants "made false and material misrepresentations and/or omissions" that they were duly licensed to "care for children such as S.M.K." The claim alleges that the alleged misrepresentations and omissions constituted unfair and deceptive practices that caused Kosteleckys to "suffer[] actual harm" "for which they are entitled to . . . compensat[ion]." As to the alleged harm, the claim asserts that the subject misrepresentations and omissions "misle[d]" Kosteleckys "into believing they were leaving their children with a licensed daycare provider."

¶47 Even when liberally construed in the light most favorable to the plaintiffs as required by M. R. Civ. P. 12(b)(6), Kosteleckys' MCPA complaint allegations pertain to alleged misrepresentations and omissions that induced them to initially and continue to take their children to the Peas in a Pod Daycare. However, it is undisputed that they did not return S.M.K. to Peas in a Pod after January 24, 2017. They acknowledge on appeal that, by operation of the 60-day regulatory grace period triggered by the expiration of the Peas in a

41

Pod license on November 30, 2016, Peas in a Pod was not operating illegally without a license until after January 30, 2017.[28] They further made no responsive Rule 56 evidentiary showing that the licensing status of Peas in a Pod had anything to do with their decision to not return S.M.K. for day care there after January 24, 2017, or that earlier notice of Allen's intent to not renew the license caused them any difficulty or related financial detriment in finding alternative day care.[29] Kosteleckys thus made no showing on the Rule 56 record that the operation of Peas in a Pod without a license, in contrast to their own independent decision-making, caused them to suffer any financial or pecuniary detriment.

¶48     In the face of that evidentiary deficiency, Kosteleckys assert for the first time on appeal that genuine issues of material fact preclude summary judgment on their MCPA claim based on their assertion that the Peas in a Pod "collection and failure to refund" their prepaid February 2017 day care payment was an unfair and deceptive practice that resulted in actual damages in the form of the unrefunded fee. However, as with the recharacterization of their contract claim, the statutory violation and causation of damages theories asserted as a basis of the MCPA claim on appeal are entirely different than those

---

[28] *See* Admin. R. M. 37.95.145(4) (2006). *See also* Deposition of MDPHHS Childcare Licensor, Kirsten Geiger, District Court Record Doc. 51, Exhibit E, pp. 131-35, *and* Kosteleckys' Opening Brief, p. 39 n.1 (testifying that during the 60-day grace period a day care's operating certificate is "lapsed . . . but not terminated" and that the day care could thus continue to lawfully operate under the lapsed license until expiration of the grace period).

[29] In fact, Mother testified that, in early November 2016, she saw a Peas In a Pod Facebook internet post announcing that Allen and Williams were considering letting their license lapse at the end of the year, and that she spoke with them about their plans right away, but never followed up because the issue "didn't come up again."

pled in the MCPA claim stated in their complaint and then litigated under Rule 56 below.[30] We hold that the District Court did not erroneously grant summary judgment to the defendants on Kosteleckys' asserted MCPA claim.

### CONCLUSION

¶49    For the foregoing reasons, we hold that the District Court did not erroneously grant summary judgment to the defendants on Kosteleckys' asserted negligence-based claims and breach of contract and MCPA claims.

¶50    Affirmed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE

---

[30] Kosteleckys cite the inclusion in their supplemental evidentiary showing of a Kostelecky bank account record indicating an amount paid to Williams on January 24, 2017, as proof that they asserted a supported "prepayment" theory of contract breach and/or MCPA violation below. However, the record on appeal indicates that they made that supplemental evidentiary showing only in support of their opposition to the defendants' secondary summary judgment corporate shield assertion that only the Peas in a Pod, LLC, entity, not Allen or Williams individually, could be liable on Kosteleckys' various claims. Nor have they made any evidentiary showing under their modified contract and MCPA claims indicating either that they requested any refund, or that Peas in a Pod or either of its principals denied or ignored any such request.